## WOODS v. NICHOLAS.
### No. 3464.

Circuit Court of Appeals, Tenth Circuit.
Sept. 5, 1947.

Morrison Shafroth, of Denver, Colo. (Charles H. Haines, Jr. and John F. Mueller, both of Denver, Colo., on the brief), for appellant.

Arthur L. Jacobs, of Brooklyn, N. Y. (Sewall Key, Acting Asst. Atty. Gen., A. F. Prescott and Maurice P. Wolk, Sp. Assts. to the Atty. Gen., and Ivor O. Wingren, U. S. Atty., of Denver, Colo., on the brief), for appellee.

Before PHILLIPS and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

Forrest M. Woods, hereinafter referred to as the taxpayer, instituted this action against Ralph Nicholas, Collector of Internal Revenue for the District of Colorado, hereinafter referred to as the collector, to recover social security taxes paid under protest for the years 1941 and 1943 pursuant to section 901, Title IX of the Social Security Act, 49 Stat. 639, section 1600 of the Internal Revenue Code, 26 U.S.C.A. Int. Rev.Code, § 1600.

These facts were established on the trial. For some time prior to 1933, the taxpayer owned and operated the Zone Cab Company in the City of Denver. In 1932, the city passed an ordinance which provided among other things that thereafter licenses to operate taxicabs should issue only to those engaged in the operation of cabs under the municipal code on April 15, 1932. The effect of the ordinance was to grant to those operating cabs on that date a limited franchise to continue in the business, and to exclude others. In 1933, the taxpayer sold all of his cabs but retained the right to the license; and he owned a certificate of convenience and necessity issued by the Public Utilities Commission of Colorado authorizing the operation of cabs within a prescribed radius outside the City of Denver. The business continued under the name of Zone Cab Company, but other individuals owned the cabs operated on the line, all of which were painted alike and bore the name Zone Cab Company. In order to comply with the requirements of the city, the legal title to the several cabs was carried in the name of the taxpayer, and the necessary certificates and other documents relating to the titles were deposited with the Manager of Safety of the city, but he was not the equitable owner of the cabs. He obtained license plates for the cabs, but the equitable owners reimbursed him at least in part for the cost. He carried public liability insurance on all cabs operated in the name of the company, but the equitable owners made reimbursement for the outlay. And he handled all of the advertising connected with the business. He determined in the first instance whether a particular vehicle should become a member of the fleet of cabs. Sometimes cabs on the line changed hands, passing from one owner to another; and in such an event, his records were changed and he took steps to have the records of the city changed accordingly. He maintained a garage at which the cabs were serviced, maintained a switchboard through which calls for cabs were passed, and maintained several call stations at different places in the city. He kept on hand a supply of gasoline, and the drivers of all cabs operated on the line were required to buy their gasoline from him. He employed a manager, a bookkeeper, a mechanic, and three telephone operators who also served as dispatchers. The owners and drivers of the taxicabs reimbursed him for a small part of the rent on the garage and of the

salaries of the telephone operators. The manager assisted in the supervision of the garage and the equipment of the taxpayer, and he sometimes dealt with complaints of patrons. The owners of the cabs furnished one mechanic. Some of the owners drove their own cabs for one shift; and in each such instance, the owner had another driver operate the cab on the opposite shift. In some instances, an owner owned more than one cab; and in some, the driver did not own a cab. The owners and drivers held meetings from time to time to formulate policies and to promulgate rules and regulations for drivers. The taxpayer and and his manager attended some of the meetings and sometimes participated in them to the extent of making suggestions. At such meetings, a day boss and a night boss were selected from the drivers who acted as foremen during their regular shift as drivers, but they served without pay. As such foremen, they employed, disciplined, suspended, and discharged drivers; and they posted rules and regulations promulgated by the owners. Whether a driver worked on the day shift or the night shift was determined by agreement of the owners and drivers. The owner of a cab could object to a particular driver operating his cab, and in that event the foreman on that shift placed the name of the driver at the foot of the extra board. The taxpayer was paid a fixed fee for the privilege of operating the cabs under his license and certificate of convenience and necessity. The fee was $3.30 per day for each cab. As the end of a shift, the driver of the cab turned into the taxpayer a worksheet, and paid to him the amount of the fixed fee and the amount due for gasoline. The driver also turned into him an amount representing the contribution of the driver to the crash fund and the sick fund maintained by the owners and drivers for their own benefit, the amount due by the driver to the salary of the dispatchers, and the amount due on rent on the garage. And if the driver did not own the taxicab, he also paid to the taxpayer the amount of a fixed fee due the owner of the cab for its use. These payments were made without reference to the amount the driver had collected from patrons during the shift. The driver kept and retained as his compensation all amounts collected from patrons over and above that paid to the taxpayer, and no accounting was made to the taxpayer of the excess. The taxpayer received the funds paid to him and made disbursement accordingly. While the taxpayer was at the place of business almost every day, ordinarily he remained there only for about an hour. The manager was there more than that, but he too was absent a large part of the time.

Entertaining the view that the individuals driving the taxicabs operated under the name of Zone Cab Company were employees of the taxpayer within the scope and meaning of the Social Security Act, and that the taxpayer was liable for the excise tax upon the remuneration earned by the drivers, the court entered judgment for the collector, and the taxpayer appealed.

The Collector presents the preliminary contention that the appeal should be dismissed because it was prematurely taken. On July 18, 1946, the court filed findings of fact and conclusions of law. These concluded with the statement that "judgment will be entered against the plaintiff and in favor of the defendant. Counsel will draw up a proper form of judgment." On the day of the filing of the findings of fact and conclusions of law, the clerk made the following entry in the docket, "July 18, 1946: Order: Findings of fact and conclusions of law and dismissal of action at pltf's costs." The clerk wrote the attorneys advising that findings of fact, conclusions of law, and decree were made and entered in the cause. On July 27, the taxpayer filed a motion for new trial; on September 3, the motion for new trial was denied; and on November 27, notice of appeal was filed in which it was recited that the appeal was from the final judgment entered July 18. On January 10, 1947, the court entered a formal judgment expressly reciting that the action be dismissed with prejudice as of July 18, 1946; and that the records be corrected in accordance therewith. The point now urged is that no final judgment was entered until January 10, 1947, and that the appeal previously taken was premature. Rule

618

of Civil Procedure 58, 28 U.S.C.A. following section 723, provides in material part that when the court directs that there be no recovery, the clerk shall enter judgment forthwith upon receipt by him of the direction, and that the notation of a judgment in the civil docket as provided in Rule 79(a) shall constitute the entry of the judgment. Rule 79(a) provides among other things that the clerk shall keep a book known as civil docket, and that all judgments shall be noted therein on the folio assigned to the action. The entry made in the docket on July 18, constituted a judgment within the intent and meaning of the rules of civil procedure. The formal judgment with its nunc pro tunc provision was not necessary as a prerequisite to the taking of the appeal. The appeal was properly taken from the original judgment and therefore it was not premature in time.

Coming to the merits, section 1600 of the Internal Revenue Code, supra, lays an excise tax upon every employer, as defined in section 1607(a), equal to three per cent of the total wages, as defined in section 1607(b), paid by him during the calendar year with respect to employment, as defined in section 1607(c). Section 1607(a) defines the term "employer" to mean a person having eight or more individuals in his employment for the time therein specified. With certain exceptions not having any material bearing here, section 1607(b) defines the term "wages" to mean all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash. Section 1607(c) provides in material part that the term "employment" means any service of whatever nature performed by an employee for the person employing him. And Treasury Regulation 107, promulgated under the statute provides in substance that generally the relationship of employer and employee exists when the person for whom the services are performed has the right to control and direct the result to be accomplished and the details and means by which the result is accomplished; that it is unnecessary that the employer actually direct and control the manner in which the services are performed; that it is sufficient if he has the right to do so; that the right of discharge is an important factor; that another factor characteristic of an employer, but not necessarily present in every case, is the furnishing to the person performing the services of tools and a place to work; that, in general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods of accomplishing the result, he is an independent contractor; and that an individual performing services as an independent contractor is not as to such services an employee.

The Social Security Act fails to contain a definition to which a court may turn in a case of this kind for a ready rule of thumb in determining whether the relationship of employer and employee exists, within the scope of the Act. But the Act should not be given a narrow, constricted interpretation with respect to its coverage, as an interpretation of that kind would fail to comport with the Congressional policy and purposes embedded in the Act. United States v. Silk, 67 S.Ct. 1463; Glenn v. Beard, 6 Cir., 141 F.2d 376, certiorari denied, 323 U.S. 724, 65 S.Ct. 57, 89 L.Ed. 582.

While the Act should be construed with the manifest Congressional policy and purposes in mind, all who render service for an industry are not necessarily employees. The employees of a private contractor engaged in the construction of a new plant for an industry at a fixed price or on a cost-plus basis are not employes of the industry. Neither is a distributor engaged in marketing at his own risk the product of another an employee of the producer. And where a separate segment of an integrated industrial enterprise is in the hands of an independent contractor, he is liable for the social security taxes imposed upon the employer insofar as that segment of the business is concerned. United States v. Silk, supra.

The question whether the relationship existing between the parties is that of employer and employee, or employer and independent contractor, or agent and inde-

pendent contractor has presented itself for determination under a wide variety of circumstances. And in determining the question courts have frequently been governed by the common-law rule that the relationship of master and servant exists where the employer has the right to direct and control the method and manner in which the work shall be done and the result to be accomplished, while the relationship of employer and independent contractor obtains where the employee engages .to perform the services according to his own method and manner, free from direction and control of the employer in all matters relating to the performance of the work, except as to the result or the product. But the Social Security Act was enacted pursuant to a public policy unknown to the common law, and the question of its applicability in a case of this kind is to be judged with reference to the purposes which Congress had in mind rather than from the rules of the common law for determining tort liability. In their consideration of the question under the Social Security Act, courts have looked with meticulous care to the constituent elements of each individual case. In Magruder v. Yellow Cab Company, 4 Cir., 141 F.2d 324, 152 A.L.R. 516, the company leased and let its taxicabs to drivers for a specified sum per day, or per week. The driver paid rental to the company, operated the cab at his own expense, and was responsible for loss or damage except that caused by collision or other casualty covered by insurance which the company carried. Placing emphasis upon the point that the company made no payment whatever to the drivers, upon the absence of right or interest of the company in the money which the drivers collected frcm their passengers, and upon the lack of control of the company over the drivers, the court reached the conclusion that the relationship between the company and the drivers was not that of employer and employees, within the meaning of the Act. In United States v. Mutual Trucking Co., 6 Cir., 141 F.2d 655, the company contracted with certain owner-operators of trucks to do hauling for it in interstate commerce. The owner-operators hauled exclusively for the company, ordinarily using their own equipment which consisted of a tractor and trailer. The trucks carried plates for which the company made application to the Interstate Commerce, but each owner-operator secured his own state license plates and driver's license. The equipment was usually marked in a manner indicating that it was operated for the company. The operation consisted of the transfer of sealed and loaded trailers between certain terminals; and the owner-operator was paid a flat rate for each trip, according to the printed schedule. All drivers of trucks were required to register at stations maintained by the company on the principal routes for the purpose of checking the time of the trip; and drivers were also required to file daily logs indicating the number of hours driven. The company maintained a road patrol consisting of certain inspectors on the routes in order to check on the conduct of the drivers with respect to observing applicable statutes and regulations relating to the operation of trucks of that kind. While observing that both the company and the owner-operators had an interest in the transportation, the court was emphatic in saying that there was no such control on the part of the company as to create the relationship of employer and employee between the company and the owner-operators or the drivers. In United States v. Silk, supra, two sets of truckers were considered, one hauling coal for Silk and the other hauling merchandise for Greyvan Lines, Inc. Silk sold coal at retail. His coalyard consisted of two buildings, one for an office and the other a gathering place for workers. He owned no trucks himself but contracted with workers owning their own trucks to deliver coal at a uniform price per ton. That was paid to the trucker out of the price which Silk received for the coal from the customer. When an order for coal was received in the office, a bell was rung in the building used by the truckers. The truckers had voluntarily adopted a call list upon which their names came up in turn, and the top man on the list had an opportunity to deliver the coal ordered. The truckers were merely given a ticket indicating where the coal was to be delivered and whether the charge was to be collected.

They were not instructed as to how their jobs were to be done. They came and went at their convenience, hauled coal for others at their pleasure, paid all expenses of operating the trucks, and furnished extra help when necessary to the delivery of the coal. They were paid after each trip, at the end of the day, or at the end of the week, as they requested, and no record was kept of their time. Greyvan Lines, Inc., operated its trucking business under a permit issued by the Interstate Commerce Commission. In addition to its principal office, it maintained agencies to solicit business in many of the larger cities in the areas served, from which it contracted to move goods. It entered into contracts with truckmen under which the truckmen hauled exclusively for it, furnished their own trucks and equipment, furnished their own labor, picked up, handled, and delivered shipments, paid all expenses of operation, furnished all fire, theft, and collision insurance which the company might specify, paid for all loss or damage to shipments, collected all moneys due the company from shippers or consignees, and turned in such moneys at the office of the company to which they reported after making delivery of a shipment. The truckers personally drove their trucks at all times or were present on the truck when a competent relief driver was driving. The trucks bore the painted designation "Greyvan Lines." The truckmen were required to take a short course of instruction in the company's methods of doing business before carrying out their contractual obligations to haul, and the company furnished to truckmen a manual of instructions which purported to regulate in detail their conduct in the performance of their duties. The company maintained a staff of dispatchers who issued orders for the movement of the truckers, but not the routes to be used. The truckmen reported at intervals to the dispatcher with respect to their positions. All permits, certificates, and franchises necessary for the operation of the trucks were obtained at the expense of the company, and the company carried cargo insurance covering the goods moved. As remuneration, the truckmen received from the company a percentage of the tariff charged, varying between 50 and 52 percent and a bonus up to three per cent for satisfactory performance of the service. Deciding the two cases together, the court stated that the right of the industry to control the method and manner the work shall be done is a factor in determining whether the worker is an employee or an independent contractor, but rejected the test of the "technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants", and approved the statement in an earlier case that "the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the act." The court further said that in determining whether the relationship is that of employer and employee, "courts will find that degree of control, opportunities for profit or loss, investment in facilities, permanency or relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete." Governed by these principles for determining the question, the court held that in each instance the truckers were not employees of the industry, within the coverage of the Act. The later case of Bartels v. Birmingham, 67 S.Ct. 1547, furnishes helpful guidance and direction, although it did not involve an industry and drivers of taxicabs or drivers of trucks. There operators of public dance halls made arrangements for orchestras to play at their establishments for a contract price. Most of the engagements were for one-night stands, though a few were for successive nights. In each instance the orchestra was built around a leader of distinctive style in the presentation and rendition of dance music. He employed musicians, paid their salaries, exercised complete control over the orchestra, and exercised the right of discharge. The operator paid to the leader the agreed price. Any excess was his profit and any deficit his personal loss. Citing United States v. Silk, supra, the court held that for purposes of the statute the relation between the operator and the leader was

that of employer and independent contractor, and that the leader rather than the operator was the employer of the musicians.

In Jones v. Goodson, 10 Cir., 121 F.2d 176, we held that the relationship between a taxicab company and the drivers of taxicabs was that of employer and employee, within the meaning of the Act. But there the company operated under its name and insignia a large fleet of taxicabs, about half of which it owned. It maintained a central office and garage, two downtown stations, a telephone exchange at its main office, 20 or 25 call stations at various places throughout the city, and a corps of personnel. It had and exercised the right to say whether a driver should work on the day or night shift; to say which cab he should drive if he operated company-owned cars; to require that the insignia and telephone number of the company be placed on all individually owned and operated cars; to require that drivers purchase all of their gasoline from the company, and, in addition, that drivers of individually owned cars buy all of their oil from it; to require that drivers operate only within the city limits; to require that they telephone the main office hourly giving their whereabouts; to require that they maintain a good record for accidents; to require that they be courteous to patrons; and to require that they be presentable in their personal appearance. And it had the right of discharge for the violation of any of these several requirements or for the violation of any other rule promulgated by the company. The difference between that case and this one is apparent. Here, the taxpayer did not hire the owners or drivers of the taxicabs, and did not have any right of control in respect to the method and manner in which they did their work. He did not have the right to determine whether they should work on the day or the night shift, did not have the right to determine which cab or cabs they should drive, and did not have the right to determine the routes over which they should operate. He did not pay them any wages or other like compensation, and he did not have the right to discipline or discharge them. He merely furnished the license and certificate of convenience and necessity, as well as certain facilities, for which he was compensated. His primary compensation was the fixed fee paid him. And he was paid certain additional sums to be applied on the rent and on the salaries of the telephone operators. The owners of the cabs bore their own responsibility with respect to the method and manner of operating the cabs, and the drivers were responsible to them in that respect. In that regard, neither the owners nor the drivers were responsible to the taxpayer.

We think that the relationship existing between the taxpayer and the owners and drivers of the taxicabs was not that of employer and employee, within the scope of the statute. United States v. Silk, supra; Bartels v. Birmingham, supra; Magruder v. Yellow Cab Company, supra; United States v. Mutual Trucking Co., supra.

The judgment is reversed and the cause remanded with directions to enter judgment for the taxpayer.