296 P.2d 983

**SALT LAKE TRANSPORTATION COMPANY, a corporation, Plaintiff,**

**v.**

**BOARD OF REVIEW OF the INDUSTRIAL COMMISSION OF UTAH, DEPARTMENT OF EMPLOYMENT SECURITY, Defendant.**

No. 8442.

Supreme Court of Utah.

May 4, 1956.

Athol Rawlins, H. R. Waldo, Salt Lake City, for plaintiff.

E. R. Callister, Jr., Atty. Gen., Fred F. Dremann, Salt Lake City, for defendant.

WADE, Justice.

Appeal from a decision of the Board of Review of the Industrial Commission finding that the Salt Lake Transportation Company was the employer of drivers of taxicabs leased by it to such drivers, and

1. Singer Sewing Machine Co. v. Industrial Comm. of Utah, Department of Placement and Unemployment Insurance, 104 Utah 175, 134 P.2d 479, rehearing denied 104 Utah 196, 141 P.2d 694; Creameries of America, Inc., v. Industrial Comm., 98 Utah 571, 102 P.2d 300.

that it was, therefore, liable for payment of unemployment compensation taxes based on the earnings of these drivers.

The facts are that the Salt Lake Transportation Company, whom we shall hereafter refer to as plaintiff, is the owner of nontransferable franchises from the Utah Public Service Commission and from Salt Lake City to operate taxicabs known as Yellow Cabs. On March 1, 1955, plaintiff entered into arrangements with the drivers of its cabs under written agreements with each whereby the drivers pay a daily stipulated rental for the cabs which are leased for periods known as shifts of either 6 or 12 consecutive hours in a day. If out-of-town trips are made, 5¢ extra per mile is charged the driver, and he must report to plaintiff's garage before and immediately after making the trip. Under this agreement the drivers are not required to account to plaintiff for any moneys they collect from customers for trips in these cabs, but must deposit with it a sum of $15 to insure payment of rentals. If a cab is damaged by the negligence of its driver, he must pay damages not exceeding $50. The driver must, where possible, buy all gasoline used in the operation of the cab from the plaintiff at prevailing retail prices. (Actually it is sold to them at 3¢ less per gallon than current retail prices.) Further, the drivers were required to keep daily trip sheets, attend safety meetings, accept the cabs assigned to them for each rental shift,

allow no one other than the renter of the cab to drive it and to comply with all pertinent government regulations and laws. The drivers were not allowed to choose any shift they might want but had to accept the shift assigned to them by plaintiff. Plaintiff furnished taxicab stands, garage service, supplied all the necessary oil, grease and antifreeze liquids and defrayed all costs of repairs to the cabs. It also furnished dispatchers, switchboard and two-way radio service and carried liability insurance to protect the driver for any accident which might occur during the operation of the cab up to certain fixed amounts. The drivers were not obligated under the agreement to accept calls which they might not wish to accept, nor were they required therein to keep plaintiff informed of their whereabouts during their shifts if they didn't want to do so. Further, the evidence disclosed that the drivers sold sight-seeing tickets to customers and were paid 10% of the sight-seeing fare by plaintiff for those sales and that they accepted in payment of fares coupons sold at a discount to customers by plaintiff, and that plaintiff paid the drivers the cash for these coupons when they were turned in by them. The evidence also disclosed that if a driver did not want to take a shift assigned to him that he probably would not receive a lease.

Are the drivers lessees or in the employment of plaintiff under the provi-

90

sions of the Employment Security Act of Section 35–4–22(j) (1) and (5)? Plaintiff concedes that it is well settled in this jurisdiction that the meaning of terms "employer" and "employee" are determined by the Act and are not confined to the common-law concepts of their meaning. The Employment Security Act having been enacted under the police powers for the benefit of the general public welfare its provisions are to be liberally construed to effectuate that purpose. Therefore, this court has held that the terms "employment," "services" and "wages" include many persons and relationships and means of compensation not contemplated by those terms under the common-law. In determining whether a relationship is included within the Act the actual status of the persons rather than the contract entered into between them will determine that question. See Singer Sewing Machine Co. v. Industrial Comm., of Utah, Department of Placement and Unemployment Insurance, 104 Utah 175, 134 P.2d 479, rehearing denied 104 Utah 196, 141 P.2d 694; Creameries of America, Inc., v. Industrial Comm., 98 Utah 571, 102 P.2d 300.

██ Whether the drivers were in "employment" within the meaning of the Act depends upon whether they performed services for plaintiff "for wages or under any contract of hire written or oral, express or implied." They could meet these requirements and still not be in "employment" if they were (A) "free from control or direction over the performance of such services" and (B) "such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed" and that they were (C) customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the contract of service. 35–4–22(j) (5), U.C.A.1953. Plaintiff states in its brief that it is only concerned on this appeal with (1) whether there had been a showing that the drivers performed "services" for it and (2) "that such services were performed for wages or under a contract of hire and that they are not concerned with the exclusionary provisions we have set out above of Section 35–4–22(j) (5) (A, B and C). In the Creameries of America, Inc. case, supra, this court said on page 580 of 98 Utah, on page 304 of 102 P.2d:

"Section 19(p) [now Sec. 35–4–22 (p)] defines 'wages' as 'all remuneration payable for personal services, including commission and bonuses and the cash value of all remuneration payable in any medium other than cash.' The terms 'services' and 'personal service' used in defining 'wages' are not specifically defined in the Act. In ordinary usage the term 'services' has a rather broad and general meaning. It includes generally any act performed for the benefit of another under some arrangement or agreement

whereby such act was to have been performed. The general definition of 'service' as given in Webster's New International Dictionary is 'performance of labor for the benefit of another'; 'Act or instance of helping or benefiting'. The term 'personal service' indicates that the 'act' done for the benefit of another is done *personally* by a particular individual."

In the instant case there is no question but what plaintiff's business is that of operating taxicabs. When the drivers operate those cabs under their so-called lease agreements with plaintiff they perform a service for plaintiff. The remuneration they receive for these services, even though not paid directly by plaintiff, under the definition of our statute, is "wages." Further, we are of the opinion that it was not unreasonable for the commission to have found, as it did, that plaintiff actually had the right to control the manner and method of the drivers' activities in performing the services. If a driver were acting in a manner inimical to the interests of plaintiff, such as being drunk while on a shift, plaintiff could order him to report to the garage and they would take the cab away from him, or if the driver were in no condition to safely drive, would send someone to bring the cab in, or if a driver refused a shift assigned to him, plaintiff could refuse to lease to him any more. From what we have said it is apparent that the Commission was correct in finding that the drivers were in the employment of plaintiff for the purposes of the Act. We are aware that the cases of various states and jurisdictions as to whether cab drivers operating under lease agreements are employees within the meaning of workmen's unemployment compensation acts are not uniform, some holding under the facts of the individual case that they are and others that they are not. See cases and annotations in 152 A.L.R. 517; 174 A.L.R. 1419 and 10 A.L.R.2d 358.

Affirmed.

McDONOUGH, C. J., and CROCKETT, HENRIOD and WORTHEN, JJ., concur.