UNITED STATES of America, Appellant,

v.

T. S. FLEMING and James E. Fleming, Jr., d/b/a City Transportation Company, and City Transportation Company of Tyler, Appellees.

No. 18593.

United States Court of Appeals Fifth Circuit.

Aug. 29, 1961.

Paul N. Brown, U. S. Atty., Tyler, Tex., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, C. Guy Tadlock, Attys., Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Robert N. Anderson, George F. Lynch, Attys., Dept. of Justice, Washington, D. C., Joe Tunnell, U. S. Atty., Lloyd W. Perkins, Asst. U. S. Atty., Tyler, Tex., for appellant.

Henry Schwartz, II, Tyler, Tex., for appellees.

Before TUTTLE, Chief Judge, and HUTCHESON and JONES, Circuit Judges.

JONES, Circuit Judge.

The question here is whether the drivers of cabs owned by the appellees received from the appellees wages, within the meaning of the Federal Insurance Contributions Act, 26 U.S.C.A. (I.R.C. 1939), § 1400 et seq., as amended, so as to subject the appellees to a tax imposed with respect thereto under the terms of the Act.

There is no dispute as to the facts as found by the district court which were for the most part stipulated.

The appellees, T. S. Fleming and James E. Fleming, Jr., were, during the taxable year 1952 and the taxable quarter ended March 31, 1953, members of a partnership, doing business in Tyler, Smith County, Texas, under the name and style of City Transportation Company. The appellee corporation, City Transportation Company of Tyler, was organized on or about April 1, 1953, to take over and operate the business theretofore carried on by the partnership.

During the period here in controversy, the partnership and its successor, the Corporation (both of which are hereafter sometimes collectively referred to

as the Company), were engaged in the business of carrying passengers for hire. The Company owned 20 and 25 automobiles which were licensed for use as taxicabs pursuant to the ordinances of the City of Tyler regulating the operation of automobiles for hire; fixing the fares to be charged; providing for a 2 per cent. gross receipts tax to be collected. The Company also applied for and obtained pursuant to the ordinances and amendments of the City of Tyler, a license to operate its taxicabs for hire. The Company further bore the cost of the bond or policy of insurance obtained to comply with Section 5 of an ordinance of the City of Tyler. The Company paid the 2 per cent. gross receipts tax due the City of Tyler. Gross receipts for the purposes of this city tax are defined to be 100 per cent. of the local fares received from the passengers by the drivers.

The automobiles owned by the Company bore either the name "City Cab" or "Yellow Cab". Each cab driver operated a taxicab pursuant to an agreement entered into between the individual drivers and the Company. Each driver obtained a specific automobile for a 12-hour or shorter work period. During the taxable period in question, about 18 of the automobiles were so operated in the day time; about 7 or 8 at night. Approximately 4 or 5 of the automobiles had two drivers, one for the day shift and one for the night shift and thus were operated for the entire 24-hour period. The agreement between the individual daytime driver and the Company called for the payment by the driver to the Company of 65 per cent. of the gross receipts or fares collected from the passengers. In some instances the agreement called for the payment by the driver to the Company of 66⅔ per cent. of such receipts. In the case of the night drivers, the agreement between the individual driver and the Company called for the payment by the driver to the Company of 60 per cent. of the gross receipts or fares collected from the passengers.

In practice, the Company kept the cabs serviced and in repair. The Company maintained its own garage where it serviced the cabs and kept them in general repair. In some instances individual drivers took their cabs home at night. Cabs not so taken home at night were parked on the Company's lot when not in use. Tyler City ordinance did not allow cruising on the streets of the City. No call stands were maintained by the Company on the streets of Tyler.

Each cab was equipped with a 2-way radio installed and maintained at the expense of the Company. In its Central Office, the Company maintained a switchboard to receive calls from customers and a radio transmitter to relay such calls to the drivers. The Company also maintained direct lines with the hotels and various restaurants. Customers were also obtained by personal solicitation of the individual drivers. Calls which came in for particular drivers were relayed to that driver.

The drivers were required to call the appellees' dispatcher after each passenger was delivered and report the location of the driver. The drivers were required to report that they had made a pickup after idling at a certain point. If an individual driver's car was in disrepair an official of the taxpayers would designate to the driver which vacant cab he was to drive that day. Before a driver could take time off for lunch he was required to report to the dispatcher. By the use of the radio the dispatcher attempted and did direct drivers to certain locations and instructed them to remain idling at these points. In this way the dispatcher was able to prevent the accumulation of cabs in certain areas of the City. None of the drivers could use the cabs for their own personal use. The Company neither had nor exercised any control over the type of clothing worn or the personal appearance of the drivers. In about March, 1953, each cab was equipped with a meter by which the fares payable by customers were determined. Prior to the installation of meters, the drivers determined the fares so payable from the mileage indicator in the cabs. Before and after the installation of meters trip sheets re-

quired by the Tyler Police Department were maintained by the drivers showing the place of pick up, the fare paid, and other pertinent data.

The individual drivers had no capital investment in the Company's cabs for hire. Under the agreement the Company supplied all the gasoline, oil, grease and antifreeze fluids. The individual drivers maintained no business telephones of their own; they did not individually have a regular place of business; nor did they individually advertise their services. The Company did on occasion discharge [1] or sever relations with an individual driver when in the opinion of the Company such driver had violated a city ordinance.

No records of the earnings of the drivers were kept by the Company other than those required to enable the Company to comply with the requirements of the ordinance respecting the payment of the gross receipts tax to the City of Tyler. At the end of each work period the individual drivers checked in. The gross receipts were then balanced against the trip sheets and/or meter reading and the respective shares of the Company and the driver determined. The driver then paid the Company its share thus determined and retained his share.[2] There was no accountability for tips and gratuities received by the drivers. Each driver

was required to pay 15 cents per day to the Company, a self insurer, for insurance against physical damage to his cab.

The Commissioner of Internal Revenue determined that the amounts received and retained by the drivers were wages received by the drivers with respect to employment as defined in the Act. A tax was assessed and collected. The amounts of the taxes so collected were credited to a "dummy account" and no part of the tax was credited to or allocated for the benefit of any of the individual drivers. An undetermined number of drivers had paid employment taxes as self-employed individuals.

In its conclusion of law the district court found that the drivers were employees within the common law definition of that term and hence were employees within the taxing statute.[3] The Court also concluded that the sums retained by them were not wages. The Court, in its conclusions of law, stated:

> "Moreover, the evidence is clear that a number, and for aught that appears this could be a substantial number, of the drivers paid self-employment tax as self-employed individuals. * * * As to them at least, the tax imposed represents a second, or double, assessment of the same tax without credit being given to any individual account."

---

1. The appellees object to the use of the word "discharge" as indicative of an employer-employee relationship.

2. The district court included in its findings of fact the following:
   "The Company paid the drivers no wages and promised them none. The only remuneration received by the drivers was paid to them by the passengers for services rendered directly to such passengers." The Goverment challenges this assertion and contends that it is not the finding of a fact but an erroneous conclusion of law.

3. When used in this subchapter—
   " * * * (d) Employee, The term "employee" means—
   * * * * *
   "(2) Any individual who, under the usual common law rules applicable in de-

termining the employer-employee relationship, has the status of an employee; or
   * * * * *
"if the contract of service contemplates that substantially all of such services are to be performed personally by such individual; except that an individual shall not be included in the term "employee" under the provisions of this paragraph if such individual has a substantial investment in facilities used in connection with the performance of such services (other than in facilities for transportation), or if the services are in the nature of a single transaction not part of a continuing relationship with the person for whom the services are performed." 26 U.S.C.A. (I.R.C.1939) § 1426(d).

Judgment was entered for the appellees and from that judgment the United States has appealed.

There are a number of reported decisions holding that cab drivers are employees under Social Security and Unemployment Compensation statutes. 42 U.S.C.A. § 301 et seq. Jones v. Goodson, 10 Cir., 1941, 121 F.2d 176; Kaus v. Huston, D.C.N.D.Iowa 1940, 35 F.Supp. 327, affirmed 8 Cir., 1941, 120 F.2d 183; Michigan Cab Co. v. Kavanagh, D.C.E.D.Mich. 1941, 82 F.Supp. 486; Read v. Warkentin, 185 Kan. 286, 341 P.2d 980; Salt Lake Transportation Co. v. Board of Review, 5 Utah 2d 87, 296 P.2d 983; Appeal of Farwest Taxi Service, 9 Wash.2d 134, 114 P.2d 164; Kaus v. Unemployment Compensation Commission, 230 Iowa 860, 299 N.W. 415; Radley v. Commonwealth, 297 Ky. 830, 181 S.W.2d 417. Other decisions have held that cab drivers are not employees. New Deal Cab Co. v. Fahs, 5 Cir., 1949, 174 F.2d 318, certiorari denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496; Economy Cab Co. of Jacksonville v. Fahs, 5 Cir., 1949, 174 F.2d 321, certiorari denied 338 U.S. 818, 70 S.Ct. 61, 94 L.Ed. 496; Party Cab Co. v. United States, 7 Cir., 1949, 172 F.2d 87, 10 A.L.R.2d 358,[4] certiorari denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496; Woods v. Nicholas, 10 Cir., 1947, 163 F.2d 615; United States v. Davis, 1946, 81 U.S.App.D.C. 35, 154 F.2d 314; Magruder v. Yellow Cab Co., 4 Cir., 1944, 141 F.2d 324, 152 A.L.R. 516; Co-op Cab Co. v. Allen, D.C.M.D.Ga.1947, 82 F.Supp. 695; Parks Cab Co. v. Annunzio, 412 Ill.

549, 107 N.E.2d 853; Martin v. Wichita Cab Co., 161 Kan. 510, 170 P.2d 147.

To the extent that it is pertinent we look to the New Deal Cab Co. case [5] for guidance. There the Court quoted, in part, the provisions of Treasury Regulations 106, § 402.204,[6] as an excellent statement of the common law test of the employer-employee relationship. As was said in the Party Cab Co. case, supra, to which approving reference is made in the New Deal Cab Co. case, "Thus it appears that the most important factor in determining the employer-employee relationship is that of control, which the former either exercises or has the authority to exercise over the latter." 172 F.2d 87, 92, 10 A.L.R.2d 358, 366. See also Strangi v. United States, 5 Cir., 1954, 211 F.2d 305; Bartle v. Travelers Insurance Co., 5 Cir., 1948, 171 F.2d 469. The rule in Texas is the same. Mid-Continent Freight Lines v. Carter Publications, Tex.Civ.App., 336 S.W.2d 885.

Although control or right to control is the most important factor in determining whether the employer-employee relationship exists, it is not the sole test. This was recognized by this Court in Strangi v. United States, supra. There, quoting the Restatement, it was said [211 F.2d 307]:

"In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

to be accomplished by the work but also as to the details and method by which that work is accomplished. That is an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee." 174 F.2d 318, 319.

4. Authorities are collected in the annotation at 10 A.L.R.2d 369.

5. The Economy Cab Co. case, supra, was decided on the same day as the New Deal Cab Co. case and upon its authority.

6. "Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee. Generally such employment exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer; and

"(i) whether or not the parties believe they are creating the relationship of master and servant." Restatement, Agency § 220.

The quoted section of the Restatement has been cited with approval by the Supreme Court of Texas. Humble Oil & Refining Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995, 998.

It is by the foregoing tests that the facts disclosed by the record are to be measured. Nearly all of the cab trips had their origin in a call to the Company offices and a relay of the call to a driver by radio. Drivers were required to report before starting a trip and on completing one. The Company directed the drivers as to the locations to which they should go to wait for calls. Drivers were required to advise the dispatcher before going to lunch. The drivers had, in theory but almost never exercised in practice, a right to refuse to make a trip when directed to do so by the Company dispatcher. The cabs were kept on the Company's lot when not in service. The drivers were prohibited from using the cabs on any personal matters. The drivers accounted for their fares by meter readings. The Company and the drivers participated in the fares collected on a percentage basis. The Company furnished gasoline, oil, grease and antifreeze fluid. In the New Deal Cab Co. case the factual situation is in sharp contrast with what it is here. The New Deal drivers had no directions from the Company and no contacts during the day with it. The New Deal Cab Co. had no way of giving calls to its drivers. They could seek fares wherever they chose. They could charge as much or as little as they saw fit. The New Deal drivers could use the cabs for their own purposes, even for fishing trips. The New Deal Cab Co. had no interest in the fares collected by the drivers. The drivers paid fixed sums for the use of the cabs, and receiving this the Cab Company neither knew nor cared what the drivers were doing. In the New Deal case the finding of absence of control required a decision that an employer-employee relationship did not exist. The large measure of control here present, the operation by the Company of a taxi business rather than being merely a renter of cabs, and the other factors require a determination that the employer-employee relationship existed. Whether the district court's determination that the drivers were employees is a finding of fact or a conclusion of law, we are convinced that it was correct.

We think the argument, persuasive as it seemed to the district court, that the remuneration received by the drivers was not wages and hence no tax was payable with respect thereto, is a fallacious one. The court thus stated its initial conclusion of law:

"The Court is of the opinion that the individual taxicab drivers involved are employees within the common law definition of 'employee.' See Section 1426(d), supra. Nevertheless, the Court is of the further opinion that the additional Employment (FICA) tax paid by plaintiffs, and here in controversy, were illegally and erroneously assessed and col-

lected from plaintiffs. The statute by which the Employment (FICA) tax is imposed by levies the tax upon wages, as defined therein, paid employees. See Sections 1400, 1401, supra. But, here the taxes imposed are not based upon money or wages paid the drivers by plaintiffs, but upon an arbitrary percentage of plaintiffs' gross receipts. Plaintiffs neither paid nor promised to pay the drivers anything. Cf. New Deal Cab Co. v. Fahs, 174 F.2d 318 (C.A. 5, 1949). The only remuneration received by the drivers was received directly from the riding public, not the plaintiffs, and the services performed by the drivers for which such remuneration was received were rendered directly to the riding public. Cf. Party Cab Co. v. United States of America, 172 F.2d 87 [10 A.L.R. 2d 358] (C.A. 7, 1949)."

"Wages" means remuneration for employment. 26 U.S.C.A. (I.R.C.1939) § 1426(a). There being an employer-employee relationship, as the district court correctly determined, and the taxicab business being the business of the employer, it follows that the collections of fares made by the employees for the employer are of funds of the employer and received for the employer's account. If the remuneration accrues from a service rendered by the employee in the employment, that remuneration does not fall outside the category of wages merely because the employee's remuneration is based upon a commission and is withheld in the employee's accounting with his employer for collections made. There is no analogy between the remuneration here involved and tips and gratuities.

That some employees may have erroneously made tax payments as self-employed individuals should be no deterrent to requiring the payment of a proper tax from those who owe it.

The conclusions we have reached require that the judgment of the district court be reversed and that judgment be here rendered for the United States.

Reversed and rendered.

HUTCHESON, Circuit Judge (dissenting).

I have all along been, and still am, of the clear opinion that this case is ruled by the decisions of this court in New Deal Cab Co. v. Fahs, 5 Cir., 174 F.2d 318 and Economy Cab Co. v. Fahs, 5 Cir., 174 F.2d 321 (certiorari denied in both cases in 338 U.S. 818), and Party Cab Co. v. United States, 7 Cir., 172 F.2d 87, 10 A.L.R.2d 358, certiorari denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496. It seems to me that the decision in this case is too legalistic and smacks too much of the valley of dry bones, and that, as such, it runs directly counter not only to the decision but to the thoughtful and eminently sound reasoning of this court, speaking through Judge Sibley, in New Deal Cab Co. v. Fahs, supra, and that of the Seventh Circuit, speaking through Judge Major, in Party Cab Co. v. United States, supra. I, therefore, vote to affirm the judgment of the district court and respectfully dissent from the opinion and judgment of this court reversing that judgment.