341 F.Supp. 1257 (1972)
AIR TERMINAL CAB, INC., Plaintiff,
v.
UNITED STATES of America, Defendant.
AIRWAY TAXI COMPANY, Inc., Plaintiff,
v.
UNITED STATES of America, Defendant.
Nos. 71 C 323(4), 71 C 324(4).
United States District Court, E. D. Missouri, E. D.
April 5, 1972.
Lashly, Caruthers, Rava, Hyndman & Rutherford, St. Louis, Mo., for plaintiffs.
Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., Michael C. Durney, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM
WANGELIN, District Judge.
These consolidated cases are suits for refund by two taxicab companies of partial payment of an assessment of withholding, Federal Insurance Contribution Act (FICA), and Federal Unemployment Tax Act (FUTA), taxes, penalties *1258 and interest allegedly owed by plaintiffs. The plaintiff taxpayers have each paid one quarter of the alleged liabilities under protest. The Government has counterclaimed for alleged liabilities for other quarters, and thus the question of the total alleged liability is in issue for each plaintiff for the years 1965 through 1968.
The parties have entered into a Stipulation of Facts and Issue of Law, and have filed briefs in support of their respective positions and have presented oral arguments to the Court. The Court adopts the Stipulation of Facts and Issue of Law as its Findings of Fact.
Plaintiffs, Air Terminal Cab, Inc. (hereinafter referred to as Air Terminal), and Airway Taxi Company, Inc. (hereinafter referred to as Airway), are corporations organized and existing under and by virtue of the laws of the State of Missouri, with their principal offices and places of business in St. Louis County, Missouri, within the Eastern Division of the Eastern District of Missouri.
On or about September 18, 1970, the Commissioner of Internal Revenue assessed withholding, Federal Insurance Contribution Act (FICA), and Federal Unemployment Tax Act (FUTA) taxes, penalties, and interest against Air Terminal and Airway in the following amounts for the following periods:

 A. AIR TERMINAL
 TYPE OF TAX PERIOD AMOUNT
Withholding  FICA 3/31/65 $ 2,506.47
 6/30/65 3,351.40
 9/30/65 3,263.25
 12/31/65 4,123.67
 3/31/66 4,543.71
 6/30/66 4,227.44
 9/30/66 4,402.49
 12/31/66 4,888.56
 3/31/67 5,177.48
 6/30/67 5,352.98
 9/30/67 4,581.25
 12/31/67 5,714.78
 3/31/68 5,950.73
 6/30/68 5,952.51
 FUTA 1965 $ 2,410.21
 1966 2,202.26
 1967 2,585.83
 __________
 Total $71,235.02
 B. AIRWAY
 TYPE OF TAX PERIOD AMOUNT
Withholding  FICA 3/31/65 $ 3,362.74
 6/30/65 3,432.71
 9/30/65 3,399.54
 12/31/65 3,369.71
 3/31/66 3,514.04
 6/30/66 3,478.72
 9/30/66 3,656.07
 12/31/66 3,761.83
 3/31/67 2,951.69
 6/30/67 2,914.49
 9/30/67 4,620.53
 12/31/67 5,896.38
 3/31/68 5,501.59
 6/30/68 5,148.12
 FUTA 1965 $ 1,611.80
 1966 1,673.90
 1967 2,485.10
 __________
 Total $60,778.86
 ==========

On or about October 8, 1970, Air Terminal paid the sum of Four Thousand One Hundred Twenty Three Dollars and Sixty Seven Cents ($4,123.67) with respect to the withholding and FICA taxes assessed against it for the fourth quarter of 1965 (ending December 31, 1965), and timely filed with the Internal Revenue Service a claim for refund (Form 843) thereof. On or about September 23, 1970, Airway paid the sum of Three Thousand Three Hundred Sixty Nine Dollars and Seventy One Cents ($3,369.71) with respect to the withholding and FICA taxes assessed against it for the fourth quarter of 1965 (ending December 31, 1965), and timely filed a claim for refund (Form 843) thereof.
On or about September 28, 1970, Air Terminal paid the sum of Two Thousand Four Hundred Ten Dollars and Twenty One Cents ($2,410.21) with respect to the FUTA taxes assessed against it for 1965, and timely filed a claim for refund thereof. On or about September 28, 1970, Airway paid the sum of Four Hundred Ninety Dollars and Eighty One Cents ($490.81) with respect to the FUTA taxes assessed against it for 1965, and timely filed a claim for refund (Form 843) thereof.
On May 21, 1971, Air Terminal and Airway timely filed the instant suits, vesting this Court with jurisdiction over *1259 the subject matter of the suits by virtue of 28 U.S.C., Section 1346(a) (1).
Defendant has counterclaimed for the unpaid balances of the withholding, FICA and FUTA taxes, penalties, and interest assessed against Air Terminal and Airway for taxable periods other than the fourth quarter of 1965. At the time the foregoing payments were made by plaintiffs, plaintiffs stated to the Internal Revenue Service that said payments were made under protest.
The method of operation of the two plaintiff companies is substantially similar, but each is separately owned and operated.
The business licenses or franchises obtained by Air Terminal and Airway from St. Louis County permit the companies to operate a specified number of taxicabs within St. Louis County, with the limitation that the taxicabs can pick up passengers only within the unincorporated areas of St. Louis County. The primary source of passengers in the unincorporated areas of St. Louis County is Lambert Airfield where passengers are picked up by the taxicabs waiting in line. Both companies, during the years in suit 1965 through 1968, had verbal agreements with their drivers for the operation of taxicabs exclusively of the type described herein, i. e., company owned taxicabs operated by drivers who receive their compensation by retaining a percentage of the fares collected. Licenses or franchises are also granted by St. Louis County to operators whose businesses involve drivers who own their own cabs, as well as operators whose businesses involve company owned taxicabs operated by drivers who pay the company a fixed daily or weekly payment for the cab.
The companies do not have formal business offices but are operated from the homes of their respective presidents. They do not advertise nor do they have listed telephone numbers in either the regular or classified pages of the telephone directory. The taxicabs owned by the companies are not radio equipped and the companies have no radio equipment or radio or telephone dispatchers. Members of the public do not telephone the homes of the presidents for a taxicab. The drivers do not regularly telephone the presidents to report their whereabouts or for instructions. Unless a president or his wife is at home a driver would not be able to contact the president. No effort is made to have someone regularly available at the presidents' homes to answer telephone calls pertaining to the taxicab business. In many instances, the drivers do not communicate with the respective presidents for days at a time. If it becomes necessary for a president to contact a driver, he can do so by leaving a message at the service station to be picked up by the driver at the end of his shift, or by calling the driver at home after working hours. In emergency situations, drivers are sometimes contacted by calling a limousine service office at the airport and asking personnel there to relay a message to the airport taxicab starter for delivery to the driver when he appears. It would be possible for a president to drive by and leave such a message although this has never been done.
During the years in suit, 1965 through 1968, Air Terminal owned twelve (12) Fords, each of which is painted green, with the words "Lambert Airfield Cab, Co." painted in black letters on the door. Airway owned twelve (12) Chevrolets, each of which is painted green, with the words "Lambert Airport Cab, Co." painted in black letters on the door. The taxicabs are equipped with fare meters.
When not in use, the taxicabs owned by each company are parked at separate, independently owned service stations, in return for which, each company contracts out to the particular service station the minor maintenance and repair work that is to be done on the taxicabs. (By minor repairs are meant those types of repairs which service station personnel are normally able to accomplish.) Major repair work is arranged for by the company and contracted to others at company expense. Periodic checks and regular minor maintenance *1260 work are arranged for by the company and performed at the service stations at company expense. On a weekly basis, the company presidents check on the maintenance and repair work performed by the service stations.
These service stations are located nearby Lambert Airfield. The companies maintain no garages or maintenance facilities of their own. Neither company maintains regular supervisory personnel at the independently owned service station lots, and has no supervisory personnel other than the respective presidents. The respective presidents operate the businesses on a part time basis. On an irregular basis and from time to time the presidents check the mileage and trip readings of the fare meters as well as the mileage registered on the odometer of the taxicabs.
The companies carry liability insurance on their taxicabs, but do not carry nor have they ever carried collision or workmen's compensation insurance. The companies bear the risk of collision damage to their taxicabs. The drivers do not carry any insurance on their operation of the taxicabs.
During the years in suit the drivers of the companies' taxicabs operated in the following way:
(a) At the beginning of their shifts, each of the drivers picks up the taxicab he is to drive at the service station where the particular driver's company keeps the taxicabs pursuant to the maintenance-parking arrangement described above. The keys to the taxicabs are kept by the company in the service station office on a board when the taxicabs are not in use. While it is not company policy, some drivers have their own keys made and retain possession of them and the company does not object.
(b) From the service station, the drivers usually proceed directly to Lambert Airfield to pick up fare-paying passengers.
(c) After a passenger has been left at his destination, the drivers usually return directly to Lambert Airfield to pick up another fare-paying passenger. A driver makes an average of six (6) trips a day, consisting of transportation of a passenger from Lambert Airfield to the passenger's destination and return to the Airfield.
(d) The drivers maintain a trip sheet on which is to be noted the pick up point and destination of each fare-paying passenger and the amount of the fare paid by each passenger.
(e) The drivers by agreement may, and from time to time do, carry passengers for hire to places well outside the limits of the metropolitan St. Louis area. In such instances, the trip is not recorded on the meter and a basic fare of ten cents ($.10) per mile (which is subject to negotiation between the passenger and the driver) is charged the passenger. The trip and the fare charged is recorded on the trip sheet maintained by the driver.
(f) The drivers by the terms of the St. Louis County franchise may pick up passengers by agreement with an individual passenger outside the unincorporated areas of St. Louis County. Usually this takes place when a driver agrees with an airport passenger to pick him up on his return to the airport.
(g) At the end of a shift, each driver deducts from the total amount of fares collected, the amount expended for gasoline and oil. The amount remaining is then divided equally between the company and the driver. The driver takes the company's share and puts it in an envelope then along with the trip sheet drops the envelope through a slot in a metal strong box at the service station where the taxicabs are parked when not in use. The driver retains his own share of the fares collected and receives no other remuneration. These envelopes are picked up regularly by the president of the company. The trip sheets and *1261 envelopes are furnished to the drivers by the companies.
(h) The drivers do not use the taxicabs for their personal use. At the end of their shift, the drivers return the taxicabs to the service station to be parked and left until the next shift.
The drivers who drive the taxicabs owned by the plaintiff companies, as well as drivers for other taxicab companies in the St. Louis and St. Louis County areas, are organized into and are members of Local 688, Warehouse and Distribution Workers Union, affiliated with the International Brotherhood of Teamsters, Chauffeurs and Warehousemen of America. Both companies entered into identical labor contracts. (Copies of the pertinent labor contracts have been furnished to the Court).
The stipulated issue of law is as follows:
Whether plaintiffs were employers of their taxicabs drivers for the purposes of the income tax withholding provision, the Federal Insurance Contribution Act (FICA), and the Federal Unemployment Tax Act (FUTA) for the years 1965 through 1968.
An "employer" is defined by Section 3401(d) of the 1954 Code as being "the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person." An "employee" is defined as:
"(a) The term `employee' includes every individual performing services if the relationship between him and the person for whom he performs such services is the legal relationship of employer and employee.
* * * * * *
"(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee." Reg. 31.3401(c)-1(a) (b).
And see, Treas.Reg. 31.3121(d)-1(c), and Treas.Reg. 31.3306(1)-1(a) (b).
There is no dispute that the common law rules are to be used in determining whether an employer-employee relationship exists, [H.Conf.Rep.No. 2771, 81st Cong., 2d Sess. p. 104 (1950-2 Cum.Bull. 365, 372)], and that the element of control is essential to the existence of such a relationship. See, United States v. W. M. Webb, Inc., 397 U.S. 179, 192, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970).
The plaintiffs have cited cases raising the issue of the employee-employer relationship involving labor laws [e. g. Adams Dairy Company v. Dairy Employees Union, 363 Mo. 182, 250 S.W.2d 481 (Mo.1952)], workmen's compensation laws [e. g. Dawson v. Clark Oil and Refining Corporation, 410 S.W.2d 353 (Mo.App.1966); Johnson v. Simpson Oil Company, 394 S.W.2d 91 (Mo.App. 1965)] and tort liability [e. g. Sharp v. W. & W. Trucking Company, 421 S.W.2d 213 (Mo. En Banc 1967); Dean v. Young, 396 S.W.2d 549 (Mo.1965)]. And defendant has cited a number of Missouri cases involving taxicab companies and their drivers. See, e. g. Harris v. Mound City Yellow Cab Co., 367 S.W.2d 43 (Mo.App.1963); Chastain v. Winton, 347 Mo. 1211, 152 S.W.2d 165 (Mo.1941). In each of the cases cited, the courts looked to a number of factors to resolve the basic issue of control as it pertained to the particular employment relationship before the Court. The same approach is applicable to the *1262 present case and the Court relies particularly on the taxicab company cases in the federal courts. See cases cited in United States v. Fleming, 293 F.2d 953, 956 (5th Cir. 1961); 10 A.L.R.2d 369.
In the case of Party Cab Company v. United States, 172 F.2d 87 (7th Cir. 1949), cert. denied 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496, the court noted the importance of the element of control and stated, at pp. 92-93:
"As to the control which plaintiff exercised over the drivers, the Board in its brief states, `The taxpayer controls whether a particular individual works, when his working shift begins, how long it may last, when it ends, which taxicabs he is allowed to use, and the fact that only a particular driver may operate a taxicab during the shift in question,' and it states further, `and a much more realistic and effectual control is found in the undisputed fact that violation of the taxpayer's rules or regulations might result in the taxpayer's refusing to allow the offender to take out a taxicab again.'
"The weakness of this argument on control lies in the fact that the elements relied upon by the Board are matters which concern the plaintiff's business rather than the services performed by the drivers. The matter of control which is material is that which the plaintiff exercised over the drivers during the period they were in possession of the cabs rather than what the plaintiff might do either prior or subsequent to such period. Considered in this light, any control exercised by the plaintiff was quite meagre.
"During this so-called period of employment the plaintiff had no control over the area of operation or the number of miles which the cab was to be operated. It could not require the drivers to accept a call for a taxi received by it, to telephone the office or report his whereabouts, and could not require a driver to purchase gasoline or oil from it, or to account for fares collected or for tips or gratuities received. In fact, it appears that a driver had the same freedom as to the manner and means to be employed in the operation of a taxicab as would be possessed by any other car owner or driver. The remuneration which he received was dependent solely upon his own energy, initiative and business acumen, and the plaintiff was not interested in how much money a driver made. Thus it appears that the plaintiff had little, if any, control over the details, means, and method by which the drivers performed their services, and while the plaintiff no doubt was interested in the operation to the extent that it was in the interest of its business that the public be satisfactorily served, we are unable to discern how it had any considerable authority over the accomplishment of such a result."
See, also, United States v. Fleming, supra; Woods v. Nicholas, 163 F.2d 615 (10th Cir. 1947).
In the present case, the factors indicating control by plaintiffs over their drivers are that plaintiffs fix the time and days which the drivers work; that the taxicabs are owned by plaintiffs; that the plaintiffs determine which taxicab will be driven by each driver; that plaintiffs periodically check mileage and fare readings; and that the plaintiffs can discharge a driver at will. Defendant also relies heavily on two additional facts: 1) the drivers are covered by a labor contract; and 2) the drivers paid plaintiffs a percentage of the fares rather than a fixed fee for use of the company-owned taxicab.
It is defendant's primary contention that a fare-splitting company is necessarily so interested in the amount of fares collected by its drivers that it exercises sufficient "control" to result in an employer-employee relationship [See, United States v. Fleming, supra] while a fixed-fee payment indicates that the drivers are independent contractors.
*1263 Each of the indicia of control set out by defendant is a factor to be considered, but the Court cannot accept defendant's contention that the fare-splitting arrangement is conclusive. The question of plaintiffs' control over the manner and means of the operation of the taxicabs is a factual question. Considering all factors, the Court concludes that the plaintiffs had little, if any, control over the means and method by which the drivers performed their services.
There were no supervisory employees, no offices, no garages, no radios, no dispatchers, no telephones, no regular contact between plaintiffs and drivers, no workmen's compensation insurance, and no minimum wages. The drivers did not report to or "check in" with the plaintiffs in any way during the time they were in possession of the taxicabs. Plaintiffs had no way to contact the drivers, or to supervise or direct the activities of the drivers while they possessed the taxicabs.
It is not necessary to determine whether or not the plaintiffs' drivers are independent contractors or lessees. The Court finds that the plaintiff taxicab companies were not "employers" of their taxicab drivers for the purposes of the income tax withholding provision, FICA and FUTA for the years 1965 through 1968. Therefore the taxes were illegally assessed and collected and plaintiffs are entitled to recover, and defendant's counterclaims will be denied.
The parties have stipulated that the amount of the judgment is purely a matter of computation, and that "Upon the entry of a decision herein the parties will agree upon the amount of the judgment and if unable to do so will submit their disagreements to the Court for decisions."
The parties will be given fifteen (15) days from the date this Memorandum decision is entered within which to submit an agreed-upon computation of the amounts paid by plaintiffs, together with interest, and judgment will thereafter be entered.