**PARTY CAB CO. v. UNITED STATES OF AMERICA.**

No. 9585.

United States Court of Appeals
Seventh Circuit.

Jan. 18, 1949.

---

SWYGERT, District Judge, dissenting.

———◆———

Phillip E. Freed, and Harry G. Fins, both of Chicago, Ill., for appellant.

Theron L. Caudle, Asst. Atty. Gen., Arthur L. Jacobs, Dept. of Justice, of Washington, D. C., and Otto Kerner, Jr., U. S. Atty., of Chicago, Ill., George A. Stinson and Ellis N. Slack, Special Assts. to the Atty. Gen., and Leroy R. Krein, Asst. U. S. Atty., of Chicago, Ill., for appellee.

Peter B. Atwood, John Kiely, Edwin F. Zukowski, and Walker, Atwood, Zukowski & McFarland, all of Chicago, Ill., amicus curiae.

Before MAJOR, Chief Judge, SPARKS, Circuit Judge, and SWYGERT, District Judge.

MAJOR, Chief Judge.

This is an appeal from a judgment adverse to the plaintiff (the taxpayer), entered January 21, 1948, in a suit to recover from the defendant taxes alleged to have been illegally assessed and collected under the provisions of Title VIII and IX of the Social Security Act, hereinafter referred to as the Act, 42 U.S.C.A. §§ 1001 et seq., 1101 et seq.

Plaintiff is an Illinois corporation organized "to operate taxicabs and automobiles for hire as a public and private carrier of freight and passengers; to buy and sell and deal in automobiles." The question for decision is whether the persons designated as the drivers of plaintiff's taxicabs are, under the terms of the Act, its employees whose earnings are wages so as to make the plaintiff liable for the tax sought to be recovered. The court below made findings of fact and conclusions of law upon which its judgment was predicated. The court also rendered a written opinion, reported in D.C., 75 F.Supp. 307.

That we are presented with a perplexing problem is evident from the opposing results which have been reached and the contrariety of views expressed in a number of cases. Referring only to the Federal cases, taxi drivers have been held to be employees in Jones v. Goodson, 10 Cir., 121 F.2d 176; Checker Taxi v. Harrison,[1] D.C.Ill., Nor.Dist., East Div., decided July 1, 1942; Kaus v. Huston, D.C., 35 F.Supp. 327 (affirmed without deciding the merits, 8 Cir., 120 F.2d 183), and Michigan Cab Co. v. Kavanagh, D.C.Mich., East Dist., Sou. Div., 82 F.Supp. 486. Such drivers have been held not to be employees in Woods v. Nicholas, 10 Cir., 163 F.2d 615; Magruder v. Yellow Cab Co., 4 Cir., 141 F.2d 324, 152 A.L.R. 516; United States v. Davis, 81 U.S.App.D.C. 35, 154 F.2d 314, and Co-Op Cab Co. v. Allen, D.C.Ga., 82 F.Supp. 695 (pending on appeal in the Fifth Circuit).

The court below, as the extensive quotations in its opinion disclose, relied strongly upon the rationale of the Supreme Court in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757. While the workmen involved in that case were not taxi drivers, the rule which the court announced in determining whether they were employees within the meaning of the Act is pertinent, subject to any change resulting from subsequent legislative action.

A study of the cases where the question has been considered discloses that varying facts account in no small measure for the contrary results which have been reached. Another factor which has played a large part is the policy pursued by the Social

---

[1] No opinion for publication.

Security Board (hereinafter referred to as the Board) and the courts in the broadening of the concept of the term "employee" and the consequent inclusion within the coverage of the Act of a number of persons who are not in ordinary usage looked upon as employees. Prior to a consideration of the facts in the instant matter, we regard it as important to note this policy of the Board and the courts which was resented by Congress and which in 1948 culminated in certain amendments to the Act expressly designed to restrict its coverage.

While the original Act enacted in 1935 defined a number of terms, it set forth no definition of the term "employee" other than that it "includes an officer of a corporation." Subsec. (a) (6), 42 U.S.C.A. § 1301. The term was implemented by Treasury Regulation 90, promulgated under Title IX of the Act, particularly Article 205 thereof. This regulation is set forth in a footnote in United States v. Silk, supra, 331 U.S. at page 714, 67 S.Ct. 1463, 91 L. Ed. 1757, and reference is made thereto. The regulation in the main followed the accepted common law test for determining the existence of the employer-employee relation. In 1939, the Board made certain recommendations to Congress for changes in the Act, with the view of broadening the definition of the term "employee." No changes were made, and the congressional intent appears to have been that the common law test be retained as embodied in the regulations theretofore promulgated by the Treasury.

Despite the refusal of Congress to broaden the scope of the word "employee" as defined in the Act, the Board apparently attempted to do so by administrative interpretation. It was argued before the courts that the term was not to be used as a word of art but rather that it should be defined in the light of the purpose of the statute and of the evils which were intended to be remedied. Similar arguments were advanced in connection with the interpretation of the term "employee" under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. In N. L. R. B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, the Supreme Court embraced the interpretation thus sought and expanded the definition of the word "employee" beyond anything which had ever been included before, and stated that the term must be understood with reference to the purpose of the Act and the facts involved in the economic relationship between the employer and the alleged employee. It held that where all the conditions of the relationship require protection, giving due consideration to the purposes of the Act, protection ought to be given. This expanded definition of the term "employee" as used in the Labor Act was in the main followed in United States v. Silk, supra, in determining its scope under the Social Security Act. The court stated, 331 U.S. at page 712, 67 S.Ct. at page 1467, 91 L.Ed. 1757:

"As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation."

A reading of this opinion leaves us in some doubt as to whether the court in defining the term "employee" intended to go beyond the scope of its common law meaning as outlined in the Treasury Regulation. Some of the language used indicates either that the court did so or in any event that a court would be justified in so doing. Mr. Justice Rutledge evidently thought that the court was going beyond the common law concept of the term, as is shown by the following statement in his concurring opinion, 331 U.S. at page 721, 67 S.Ct. at page 1472, 91 L.Ed. 1757:

"Here the District Courts and the Circuit Courts of Appeals determined the cases largely if not indeed exclusively by applying the so-called 'common law control' test as the criterion. This was clearly wrong, in view of the Court's present ruling."

The Treasury Department also evidently thought that the Supreme Court in the Silk case had enlarged the scope of the term "employee" because shortly after the rendition of the opinion in that case it proposed

a new regulation outlining the factors to be considered in making such determination. Federal Register, Vol. 12, No. 232, page 7966. Without quoting its proposed regulation, it is sufficient to note that it went far beyond any common law concept of the term "employee."

The decision of the Supreme Court in the Silk case and the proposed regulation by the Treasury Department gave rise to a controversy in Congress as to the interpretation which should be given the term "employee" under the social security legislation. As a result, in the 80th Congress, Second Session, there was introduced in the House, H.J.R. 296, reported out of the Ways and Means Committee on February 3, 1948, bearing the title, "Maintaining the Status Quo in Respect of Certain Employment Taxes and Social Security Benefits Pending Action by Congress on Extended Social Security Coverage." The resolution as introduced was passed by both Houses of Congress and amended, Sec. 1101(a) (6) of the Social Security Act, to read as follows:

"The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

We think it should be noted that Congress by the language thus employed did not exclude from coverage merely those who have the status of an independent contractor but, without describing them, others not employees under common law rules. This observation is relevant because the problem has often been considered as though there was a single alternative, that is, that the person in question must be treated either as an employee or as an independent contractor. In fact, the Board in the instant case reasons that the taxi drivers were not independent contractors and therefore they must be employees, thereby ignoring the language of the amendment which recognizes that there may be those other than independent contractors who do not come within the scope of the term "employee."

Upon submission to the President of the amendment to Sec. 1101(a) (6), it was returned to Congress with the veto of the President, with his comment that "despite representations to the contrary   *   *   * this resolution would exclude from the coverage   *   *   *   up to 750,000 employees, consisting of substantial portions of persons working as commission salesmen, life insurance salesmen, piece workers, truck drivers, *taxicab drivers*,   *   *   *   and others." (Italics ours.) The President in his veto message also stated, "In June 1947, the Supreme Court held [evidently referring to the Silk case] that these employees have been justly and legally entitled to social security protection from the beginning of the program in 1935."

The resolution was then passed as Public Law No. 642, 80th Congress, Second Session, over the President's veto. The resolution also contained a provision making the amendment defining the term "employee" retroactive to August 14, 1935, the date of the original enactment.

When the resolution was before the House on the motion to pass it over the President's veto, Representative Gearhart, who was in charge, made a statement concerning the decision of the Supreme Court in the Silk case, the proposed regulation of the Treasury Department, as well as the congressional purpose for the amendment. We think it material to quote this statement.[1]

---

[1] "However, there crept into these decisions a little of what lawyers call obiter dicta; that is, some words which were quite unnecessary to the result. These words were to the effect that, for purposes of social security, the Social Security Administration was not necessarily bound in extending the social-security coverage, by the ancient common-law definition of master and servant, or employer and employee, as you may choose to call it, but that they could take into the system as employees any persons who were dependent upon a business in the light of economic realities, thereby throwing into the entire system a confusion which required immediate legislative attention.

"The Social Security Administration and the Treasury proceeded immediately

That Congress was highly resentful and critical of this attempt to broaden the coverage scope of the Act is abundantly disclosed by Committee Report No. 1319 of the House Ways and Means Committee and Senate Report No. 1255 of the Committee on Finance, which reports were made in connection with H.J.R. 296.

It would unduly prolong this opinion and perhaps serve no useful purpose to refer to these reports in detail. In substance, they contain numerous accusations that Congress regarded the broadening scope of the term "employee," as contained both in the Social Security Act and in the Labor Act, as an usurpation by the courts and the administrative agencies of the congressional legislative function. And there can be no doubt that Congress intended to and did materially limit the term "employee" as it had been construed and applied by the administrative agencies and the courts. It established in plain and certain terms that the common law test and that only was to be applied, and again and again in the committee reports it is stated that the common law rules to be invoked must be "realistically applied."

The preceding discussion concerning the amendment to Sec. 1101 and the congressional purpose may be thought to be irrelevant because the Board does not dispute but that the question in the instant case must be determined in accordance with the common law concept of the term "employee." Its importance, however, lies in the fact that the courts generally, including those cases here relied upon by the Board, have interpreted the term so as to enlarge its scope beyond such concept, and it means that such cases and the rationale thereof carry little, if any, weight at the present time. And it is pertinent to observe that the lower court in the instant case relied largely on Jones v. Goodson, supra, and United States v. Silk, supra, both of which, and particularly the latter, as already shown, interpreted the term "employee" so as to encompass an area considerably greater than a court would now be justified in doing, and we have no way of knowing what the decision of the lower court would have been had it been confronted by the amendment of 1948 with its accompanying congressional history and purpose.

This brings us to a consideration of the facts which are embodied in detailed findings by the lower court, the more salient of which are incorporated in its opinion, D.C., 75 F.Supp. 307. For the purpose of our decision we think a brief résumé is sufficient.

Plaintiff during the taxable year involved owned twenty-two taxicabs which it was authorized to operate. It procured all city and state licenses, as well as personal injury insurance required by Illinois for their operation. It was listed in the classified telephone directory as offering taxicabs for hire, and it had an office equipped with telephones and a garage with mechanics for the repair and maintenance of its equipment. The drivers operated plaintiff's cabs under an oral agreement which existed only from day to day; in other words, a driver was assigned a particular taxicab to drive during a single day or night shift, which shift began and ended at a time determined and fixed by the plaintiff. The drivers paid the plaintiff $8.00 for the use of a cab during the day shift and $9.00 for its use during the night shift. The drivers paid for the gas and oil which they used in operating the cabs, but all other expense such as maintenance, upkeep, license fees, etc., were paid by the plaintiff. Occasionally the plaintiff called meetings of the drivers to give instructions on such sub-

---

to prepare a departmental regulation to carry that obiter dicta definition into effect. If this Congress had not interfered, tens of thousands of people in America who never dreamed they were employed by anybody and never for one moment thought they were covered by social security or subject to payroll taxes would have found that they had been swept into the social-security system by bureaucratic ukase. In other words, they would suddenly have found that they had more employers than a dog had fleas. So, to end this confusion, this Congress acted promptly, and, after thoroughgoing debate, and by a vote of nearly 7 to 1, proceeded by legislation to put the matter in order once again by restoring the ancient doctrine of the common law defining the relation of master and servant, employer and employee." (Congressional Record Vol. 94, Pages 8268–8269, (advance part) June 14, 1948.)

jects as safe driving, forbidding drinking while on duty, how to avoid and what to do in case of accidents. The drivers had no business telephones and, although not required to do so, accepted calls received in plaintiff's office. Their principal business was derived by cruising the streets of the city. The drivers had no license to operate taxicabs for hire and the operation was conducted under licenses owned by the plaintiff. The drivers received all their pay or compensation from the public. They were required to make no report to the plaintiff as to the amount so earned and received, and the plaintiff had no interest therein.

This court in Williams v. United States, 7 Cir., 126 F.2d 129, decided that the leader of a dance orchestra was not an employee of the establishment for which the orchestra performed. In doing so, we applied the common law test, and the Board here relies heavily upon the factors there enumerated, such as the right to hire and discharge persons doing the work, the method and determination of the manner of the payment of the workmen, whether or not the person doing the work is engaged in an independent business or enterprise, particularly, whether he stands to make a profit on those workers under him, which party furnishes the tools or materials with which the work is done, and who has control of the premises where the work is done. The factors thus enumerated are not inconsistent with Treasury Regulation 90, promulgated under the Social Security Act, which emphasizes "generally the relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, not an employee."

Thus it appears that the most important factor in determining the employer-employee relationship is that of control, which the former either exercises or has the authority to exercise over the latter. In this connection, the court below found that the plaintiff did exercise "a reasonable amount of control over the methods and means by which the drivers performed their services." A finding of this character has been regarded as sufficient in Jones v. Goodson, supra, and in Hearst Publications, Inc. v. United States, D.C., 70 F.Supp. 666. Notwithstanding that such a finding may be sufficient in some cases, we think that what amounts to "a reasonable amount of control" is a relative term and as a factual statement is uncertain and indefinite.

As to the control which plaintiff exercised over the drivers, the Board in its brief states, "The taxpayer controls whether a particular individual works, when his working shift begins, how long it may last, when it ends, which taxicabs he is allowed to use, and the fact that only a particular driver may operate a taxicab during the shift in question," and it states further, "and a much more realistic and effectual control is found in the undisputed fact that violation of the taxpayer's rules or regulations might result in the taxpayer's refusing to allow the offender to take out a taxicab again."

The weakness of this argument on control lies in the fact that the elements relied upon by the Board are matters which concern the plaintiff's business rather than the services performed by the drivers. The matter of control which is material is that which the plaintiff exercised over the drivers during the period they were in possession of the cabs rather than what the plaintiff might do either prior or subsequent to such period. Considered in this light, any control exercised by the plaintiff was quite meagre.

During this so-called period of employment the plaintiff had no control over the area of operation of the number of miles which the cab was to be operated. It could not require the drivers to accept a call for a taxi received by it, to telephone the office or report his whereabouts, and could not require a driver to purchase gasoline or oil

from it, or to account for fares collected or for tips or gratuities received. In fact, it appears that a driver had the same freedom as to the manner and means to be employed in the operation of a taxicab as would be possessed by any other car owner or driver. The remuneration which he received was dependent solely upon his own energy, initiative and business acumen, and the plaintiff was not interested in how much money a driver made. Thus it appears that the plaintiff had little, if any, control over the details, means, and method by which the drivers performed their services, and while the plaintiff no doubt was interested in the operation to the extent that it was in the interest of its business that the public be satisfactorily served, we are unable to discern how it had any considerable authority over the accomplishment of such a result.

The Board suggests that the plaintiff had the unlimited right to discharge by refusing to allow a driver to take out a cab. This is rather a novel application of the meaning ordinarily attributed to the word "discharge." The same argument could be made in any case where one person refuses to hire or lease an instrumentality to another, and the fact that it could refuse to renew an agreement with a driver is equally consistent with the status of an independent contractor as it is with the employee relationship.

The Board argues that the drivers are not independent contractors and, therefore, they must be employees. It is pointed out that the drivers have no capital investment, no business telephone, no regular place of business and do not advertise. And we suppose it is true, as asserted by the Board, that "the drivers go out of 'business' at the pleasure of the taxpayer, in which event they are in effect 'out of a job' like any wage earner." It is hardly accurate, however, to say that the drivers have no capital investment, when they furnish the oil and gas and the labor by which they earn a livelihood. In fact, the relation between the plaintiff and the drivers appears more like some kind of a joint venture, wherein the plaintiff provides the facilities for a fixed charge and the drivers contribute the fuel, their skill, energy and labor. It is

pointed out that the drivers have no opportunity for profit and loss of investment, but this ignores the fact that the amount of their earnings is dependent wholly upon their own efforts. Assuming, however, that the drivers cannot be properly classified as independent contractors in the common acceptance of that term, it does not necessarily follow that they are "employees" within the meaning of the Act. An affirmative conclusion that they are such employees cannot be arrived at by the process of elimination. As we have heretofore shown, Congress by its 1948 amendment recognized that under the common law there are those other than independent contractors who are not employees.

Another factor which we think strongly militates against the employer-employee relationship is that the "wages" which afford the basis for the tax were received from the public and not the plaintiff. And the services performed by the drivers and for which such "wages" were received were rendered directly to the public. Thus the public received the benefit of their services and compensated them therefor. To us it is an anomaly to reason that the drivers were employed by the plaintiff but that they served and received their entire compensation from the public. To hold that the drivers were employees under such circumstances does not, in our view, meet the intent and purpose that the usual common law rule shall be "realistically applied."

Moreover, while there is respectable authority to the contrary, we have serious doubt that it was intended by Congress that the tax should be levied upon "wages" thus earned and received. Sec. 1011(a) defines the term "wages" as "all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash." Paragraph (b) of the same section defines the term "employment" as "any service, of whatever nature, performed * * * by an employee for his employer." It requires a strained construction to think that the remuneration thus defined includes that received from the public for services rendered on its behalf. Sec. 1002 requires that the tax shall be collected by the employer "by deducting the amount of the tax from the wages as and when paid."

Sec. 1004 fixes the rates of taxation "equal to the following percentages of the wages paid by him" (the employer). All through the Act reference is made to compensation "payable by him," meaning, of course, the employer. For further illustration see Secs. 1101, 1102 and 1109.

While we need not and do not decide that "wages" paid by the public could not in any case form the basis for the tax, we do think it is a circumstance in the instant situation which strongly dispels the idea that the drivers were employees of the plaintiff within the meaning of the Act.

Treasury Regulation 91 promulgated under Title VIII of the Social Security Act excludes from the computation of wages "tips or gratuities paid directly to an employee by a customer of an employer, and not in any way accounted for by the employee to the employer." In the instant situation, neither the charges made by the drivers nor the tips or gratuities received are accounted for to the plaintiff; in fact, the plaintiff is not and has no reason to be any more interested in one than in the other.

The incongruous situation which the Board's reasoning leads to is highlighted by assuming that a driver charges and receives from his passenger $1.00 for a ride and at the same time receives a tip of 25¢. The plaintiff under the regulation need not concern itself with the amount received as a tip but in some unexplainable and mysterious manner must learn of and account for the $1.00 which the driver has received as compensation from his passenger. So far as we are able to discern, there is no more logic or reason for requiring the plaintiff to account for and pay a tax upon one item of receipt by the driver than the other.

█ While there is room for argument on both sides of the question presented for decision, we are of the view that under the amended definition of the term "employee," taking into consideration as we must the congressional purpose and direction, the drivers under the circumstances of the instant case are not included within the term. It follows that the tax was illegally assessed and collected and that the plaintiff was entitled to recover.

The judgment appealed from is, therefore, reversed and remanded, with directions that a judgment be entered in favor of the plaintiff.

SWYGERT, District Judge (dissenting).

This case lies within the borderland of what is clearly an employee-employer relationship and what is manifestly an independent contractor status. There is no doubt that a determination of the plaintiff's liability must be measured by applying the usual and applicable common-law rule. As the Court points out, if there has been any tendency to adopt a different or broader rule in cases arising out of the enforcement of the Social Security Act, the courts are now constrained from doing so by Joint Resolution 296, Public Law 642, 80th Congress, 2d Session.

Difficulty is encountered, however, in applying the common-law rule because, as in many borderline cases, different factors point in opposite directions. But I am of the view that the circumstances which indicate that these taxicab drivers are employees outweigh those which may indicate otherwise.

The plaintiff owned the taxicabs and the necessary operating licenses. It had a garage where those vehicles were housed and serviced, except for the gas and oil which was paid for by the drivers. It was listed in the telephone directory as offering taxicabs for hire and it employed three telephone operators who received calls for taxicab service although the drivers were not required to answer these calls. The drivers had no investment in equipment and no separate business apart from operating the plaintiff's taxicabs. They were required to operate their cabs during specified periods and on a day-to-day basis. Periodically the plaintiff instructed the drivers on such subjects as safe driving, forbidding drinking while on duty, how to avoid accidents, what to do in case of accidents, and what to do with articles left in cabs by passengers. If a driver disobeyed any of the company's rules or regulations, it could refuse to permit him to take out and operate a taxicab.

These circumstances are, in my opinion, the determinative factors indicating that these taxicab drivers are employees. The business of the plaintiff was the operation of taxicabs for hire. The drivers' jobs were an integral part of that business and not an incident to it. It is my view that the plaintiff's control or right to control these drivers as to the hours they should work and the manner in which their work was to be performed was sufficient to meet the test of the common-law rule.

For these reasons, I would affirm the judgment of the District Court.