Fred W. MORISH

v.

The UNITED STATES.

BILL MORISH WRECKER SERVICE, INC.

v.

The UNITED STATES.

Nos. 273–75, 274–75.

United States Court of Claims.

May 18, 1977.

L. D. Gilmer, Houston, Tex., attorney of record, for plaintiffs.

David C. Hickman, Washington, D. C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D. C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before DAVIS and BENNETT, Judges, and SKELTON, Senior Judge.

## OPINION

PER CURIAM:

These cases come before the court on defendant's motion, filed January 25, 1977, for judgment requesting that the court adopt the recommended decision of Senior Trial Judge Mastin G. White, filed December 10, 1976, pursuant to Rule 134(h), as the basis for its judgment in these cases, plaintiffs having failed to file a notice of intention to except thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants defendant's said motion and adopts the said decision as the basis for its judgment in these cases. Therefore, it is concluded that plaintiffs are not entitled to recover and the petitions are dismissed.

## OPINION OF TRIAL JUDGE

WHITE, *Senior Trial Judge*: As these two cases, which were tried jointly, involve similar facts and present the same legal problem to the court for resolution, the question of the Government's liability to the plaintiffs will be discussed on the basis of the facts in case No. 273–75.

Fred W. Morish ("plaintiff Morish") sues in case No. 273–75 to recover amounts which he was required by the Internal Revenue Service to pay for the years 1968 and 1969 as employment taxes based on the

earnings of individuals who operated auto wrecker trucks owned by plaintiff Morish.

During the years 1968 and 1969, plaintiff Morish was doing business in Houston, Texas, as a sole proprietorship under the name of Heights Auto Relief Wrecker Service. He owned five auto wrecker trucks, one of which he drove himself. The other four trucks were made available by plaintiff Morish for use by a succession of individual drivers in towing disabled motor vehicles at rates fixed by the City of Houston. An oral agreement was separately negotiated by plaintiff Morish with each individual driver, but all of the agreements were similar in nature. The principal aspects of these agreements will be mentioned hereafter in the opinion.

■ As the tax provisions[1] that are involved in this litigation relate to wages that are paid by employers to their employees, the question to be decided by the court is whether the operators of plaintiff Morish's auto wrecker trucks were or were not his employees. The rules of the common law on the employer-employee relationship are to be applied in making this determination.[2]

The issue as to whether an employer-employee relationship exists for employment tax purposes is one of fact (*McGuire v. United States,* 349 F.2d 644, 646 (9th Cir. 1965); *Air Terminal Cab, Inc. v. United States,* 478 F.2d 575, 578 (8th Cir. 1973), *cert. denied,* 414 U.S. 909, 94 S.Ct. 228, 38 L.Ed.2d 146 (1973)), and is to be determined in the light of the total situation that is before a court in a particular case (*United States v. Silk,* 331 U.S. 704, 719, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947)). Although courts have referred to various factors as being pertinent and appropriate for consideration in making such a determination, no one factor is of controlling importance. *Cape Shore Fish Co. v. United States,* 330 F.2d 961, 965, 165 Ct.Cl. 630, 636–37 (1964).

It is necessary, therefore, to outline in considerable detail the situation that existed in the 1968–69 period between plaintiff Morish and the operators of auto wrecker trucks owned by him.

■ The basic agreement between plaintiff Morish and the operator of one of his auto wrecker trucks was to the effect that plaintiff Morish would provide the operator with a fully equipped truck, including all the necessary tools; that the operator would use the truck in the business of towing wrecked or otherwise disabled motor vehicles; that plaintiff Morish would defray all the expenses incident to the operation of the truck; and that the towing fees (at rates fixed by the City of Houston) earned through the operation of the truck would be split between plaintiff Morish and the operator on a fixed percentage basis (usually 50–50), this being the operator's only source of compensation for his work.

The operator did not furnish any of the tools or other equipment needed in the conduct of the business, did not bear any part of the necessary expenses, and contributed to the enterprise only his time and efforts. It was necessary, however, for the operator to have a chauffeur's license issued by the State of Texas and an emergency wrecker driver's license issued by the City of Houston, but such licenses were obtainable at nominal cost.

There were two principal sources from which an operator of one of plaintiff Morish's auto wrecker trucks would learn of the need for towing services: from a radio dispatch service maintained by the Houston Automobile Wrecker Association, of which plaintiff Morish was a member, and from broadcasts relative to automobile accidents made by the Houston Police Department on the police-band radio.

---

1. The Federal Insurance Contributions Act ("FICA"; 26 U.S.C. § 3101 *et seq.*), the Federal Unemployment Tax Act ("FUTA"; 26 U.S.C. § 3301 *et seq.*), and the provisions of the 1954 Code relative to the collection of income taxes on wages at the source (26 U.S.C. § 3401 *et seq.*).

2. This is required by 26 U.S.C. §§ 3121(d)(2) and 3306(i), and by 26 C.F.R. § 31.3121(d)-1(c)(1).

In connection with the radio dispatch service, it should be mentioned that plaintiff Morish had entered into arrangements of a similar nature with two Houston automobile companies, known respectively as Lester Goodson Pontiac and Champion Chevrolet. Each of these companies operated an automobile sales agency and related repair facilities, but neither of them owned an auto wrecker truck. Under the arrangement with plaintiff Morish, each company was permitted to paint its name on two of plaintiff Morish's auto wrecker trucks, thus making it appear to the public that the two trucks were owned and operated by the particular company.

When anyone communicated with Lester Goodson Pontiac, for example, and asked that an auto wrecker truck be sent out to tow a disabled motor vehicle to Lester Goodson Pontiac for a repair job, the company telephoned this information to the radio dispatch service previously mentioned. A radio dispatcher then endeavored to get in touch by radio with, and give the assignment to, an operator of one of plaintiff Morish's auto wrecker trucks bearing the name of Lester Goodson Pontiac (the equipment provided by plaintiff Morish for each of his trucks included a 2-way radio). If the operators of both of plaintiff Morish's trucks bearing the name of Lester Goodson Pontiac were unavailable for the assignment (either because they were otherwise engaged or because they did not wish to handle the job), the radio dispatcher would next endeavor to communicate with, and give the assignment to, an operator of one of the auto wrecker trucks owned by plaintiff Morish and bearing the name of Champion Chevrolet; and if that attempt was unsuccessful, the radio dispatcher would endeavor to communicate with, and give the assignment to, plaintiff Morish himself (he retained one of his auto wrecker trucks for his own use). If none of plaintiff Morish's trucks was available for the assignment, the radio dispatcher would communicate with, and give the assignment to, the driver of an auto wrecker truck owned by some other member of the Houston Automobile Wrecker Association.

Requests for towing services received by Champion Chevrolet were handled in a manner similar to that outlined in the preceding paragraph of this opinion.

When the operator of one of plaintiff Morish's auto wrecker trucks towed a disabled motor vehicle to Lester Goodson Pontiac or to Champion Chevrolet, the company collected the towing fee (the amount of which was fixed by the City of Houston) from the owner of the disabled vehicle, and subsequently remitted the full amount of the fee to plaintiff Morish, who then divided the fee with the operator in accordance with the agreement between them (usually 50–50). Settlements between plaintiff Morish and the operators of his trucks with respect to the division of towing fees were accomplished at irregular but frequent intervals.

Another principal source of towing business for the operator of one of plaintiff Morish's auto wrecker trucks consisted of broadcasts relative to automobile accidents made by the Houston Police Department on the police-band radio. A radio receiver capable of receiving such broadcasts was included among the equipment provided by plaintiff Morish for each of his trucks. Also, plaintiff Morish furnished for each truck a wrecker permit or tag, which he had obtained at substantial cost and which authorized the operator of the truck to go to the scene of an automobile accident in response to a broadcast from the Houston Police Department and to solicit a towing job if a vehicle had been wrecked or otherwise disabled. Without a wrecker permit or tag, the driver of an auto wrecker truck was not permitted to go to the scene of an automobile accident or to solicit business, but could only respond to specific requests for his services.

When an operator of one of plaintiff Morish's auto wrecker trucks obtained the job of towing a disabled motor vehicle after responding to a police broadcast concerning an automobile accident, he would tow the vehicle to whatever repair shop might be designated by the owner of the vehicle, if

the owner had a choice. If the vehicle owner did not have any preference as to a repair shop, the operator would take the disabled vehicle to Lester Goodson Pontiac or to Champion Chevrolet (depending on which company's name appeared on the auto wrecker truck) for the repair job to be done there. In such event, Lester Goodson Pontiac or Champion Chevrolet, as the case might be, not only collected the towing fee from the owner of the disabled vehicle and subsequently remitted it to plaintiff Morish, but also remitted to plaintiff Morish a commission amounting to 5 percent of the charges collected for the repair of the vehicle. Plaintiff Morish would later divide the towing fee with the operator of the auto wrecker truck on the agreed percentage basis, but the operator was not entitled to any part of plaintiff Morish's 5-percent commission on the repair charges.

Plaintiff Morish's 5-percent commissions from Lester Goodson Pontiac and from Champion Chevrolet on repair jobs, as mentioned in the preceding paragraph of this opinion, were essential to the financial soundness of plaintiff Morish's business as the owner of an auto wrecker service.

Sometimes an operator of one of plaintiff Morish's auto wrecker trucks would receive an assignment from a radio dispatcher to tow a disabled motor vehicle to some place other than Lester Goodson Pontiac or Champion Chevrolet, or would respond to a broadcast on the police-band radio and be engaged to tow a disabled vehicle to some place other than Lester Goodson Pontiac or Champion Chevrolet, or would obtain, through his own "hustling," a towing job that did not involve delivery of the disabled vehicle to Lester Goodson Pontiac or Champion Chevrolet. In any such situation, the operator would collect the prescribed towing fee from the owner of the vehicle and would subsequently pay over to plaintiff Morish, on the occasion of the next settlement between them, plaintiff Morish's proper share of the fee.

During the existence of an arrangement between plaintiff Morish and an operator, plaintiff Morish permitted the operator to have complete charge of the auto wrecker truck furnished to him by plaintiff Morish. The operator could go in the truck wherever and whenever he wished to go, except that he was not supposed to take the truck outside the Houston area for personal reasons without first obtaining plaintiff Morish's permission. While awaiting business, the operator could cruise in the truck or he could station himself and the truck at whatever location he deemed desirable. When off duty, the operator could keep the truck wherever he wished to keep it (and it was generally kept at the operator's home).

An operator was permitted to exercise his own discretion as to when, where, and how he would work. Plaintiff Morish did not attempt to supervise an operator with respect to his hours of work, or the geographical section or sections of the Houston area where the operator was to work, or the manner in which the operator was to perform his duties as the operator of an auto wrecker truck.

On the other hand, the arrangement between plaintiff Morish and an operator was terminable by either party at any time, without cause and without any necessity for the party terminating the arrangement to give the other party an explanation. If an operator was not doing enough work and generating enough business in the form of towing fees and commissions on repair jobs to satisfy plaintiff Morish, or if plaintiff Morish received a report from Lester Goodson Pontiac, or from Champion Chevrolet, or from anyone else to the effect that an operator had been discourteous, drunk, disorderly, or involved in an accident, or if plaintiff Morish was otherwise concerned over the performance of an operator, plaintiff Morish would first discuss the matter with the operator and endeavor to induce him to improve his performance. If the problem could not be resolved to the satisfaction of plaintiff Morish, he would terminate the arrangement with the operator (or sometimes the operator would take the initiative in terminating the arrangement).

Plaintiff Morish was especially sensitive to, and inclined to take corrective action

promptly in response to, a complaint made by Lester Goodson Pontiac or Champion Chevrolet against an operator of an auto wrecker truck bearing the name of the particular company. Plaintiff Morish was dependent on the repair commissions from these companies—and, therefore, on their continued satisfaction and good will—for the financial viability of his business.

It should also be mentioned that plaintiff Morish maintained radios in his office and in his personally operated auto wrecker truck, so that he could monitor the activities of the operators of his other trucks.

On the basis of the total situation existing between plaintiff Morish and an operator of one of his auto wrecker trucks, it is my opinion that an employer-employee relationship existed between them.

The most important factor to be considered in determining whether an arrangement between a principal and another person for the performance of work creates an employer-employee relationship between them is whether the principal has the right to control the manner in which the other person performs the work in question. *United States v. W. M. Webb, Inc.,* 397 U.S. 179, 192, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970); *Cape Shore Fish Co. v. United States, supra,* 330 F.2d at 964, 165 Ct.Cl. at 636; *Party Cab Co. v. United States,* 172 F.2d 87, 92 (7th Cir. 1949), *cert. denied,* 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949); *McGuire v. United States, supra,* 349 F.2d at 646; *Air Terminal Cab, Inc. v. United States, supra,* 478 F.2d at 579. The existence of such a right in the principal indicates that the relationship is one of employer and employee. *Illinois Tri-Seal Products, Inc. v. United States,* 353 F.2d 216, 223, 173 Ct.Cl. 499, 510 (1965); *Avis Rent A Car System, Inc. v. United States,* 503 F.2d 423, 429 (2nd Cir. 1974); *cf. Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947).

In the present case, inasmuch as plaintiff Morish had a direct financial interest in the diligence and competency of the operators (the success of plaintiff Morish's business depended on the operators' success in getting towing jobs, in handling such jobs in a proper manner, and in diverting (where possible) repair jobs to Lester Goodson Pontiac or Champion Chevrolet), and as plaintiff Morish could terminate the arrangement with an operator at any time if he was dissatisfied with an operator's performance in any of the respects mentioned parenthetically, it seems to be clear that plaintiff Morish had the *right* to control the manner in which the operator did his work. The circumstance that plaintiff Morish exercised that right only in a broad sense by generally monitoring the activities of operators and calling them individually to account whenever an operator was not performing to plaintiff Morish's satisfaction does not militate against the *existence* of plaintiff Morish's right of control, particularly as the nature of the work involved here was such that it did not require—or, indeed, permit—very much actual supervision by plaintiff Morish. *McGuire v. United States, supra,* 349 F.2d at 646; *Air Terminal Cab, Inc. v. United States, supra,* 478 F.2d at 580.

The existence of the *right of control* in plaintiff Morish leads to the conclusion that he was the employer of the operators of his auto wrecker trucks.

The following are additional factors which also lead to the conclusion that the relationship between plaintiff Morish and an operator of one of his auto wrecker trucks was that of employer and employee:

(1) The operator did not have a substantial investment—or, indeed, any investment whatever—in the tools and equipment needed for the performance of the work. *Cape Shore Fish Co. v. United States, supra,* 330 F.2d at 965, 165 Ct.Cl. at 636; *Illinois Tri-Seal Products, Inc. v. United States, supra,* 353 F.2d at 228, 173 Ct.Cl. at 519; *Avis Rent A Car System, Inc. v. United States, supra,* 503 F.2d at 429.

(2) The operator did not bear any part of the expense involved in operating the auto wrecker truck entrusted to him by plaintiff Morish. *Avis Rent A Car System, Inc. v. United States, supra,* 503 F.2d at 429; *cf. Party Cab Co. v. United States, supra,* 172

F.2d at 91 (operators of taxicabs paid for gasoline and oil); *New Deal Cab Co. v. Fahs,* 174 F.2d 318, 320 (5th Cir. 1949) (taxicab operators paid for gasoline), *cert. denied,* 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496 (1949).

(3) The operator was required to account to plaintiff Morish for all sums earned through the operation of the auto wrecker truck. *Cf. Party Cab Co. v. United States, supra,* 172 F.2d at 91–92 (taxicab operators rented cabs from owner for a flat fee and kept all earnings); *New Deal Cab Co. v. Fahs, supra,* 174 F.2d at 320 (similar to *Party Cab Co.* ).

(4) The operation of an auto wrecker truck did not require any special training or skill on the part of the operator. *Cape Shore Fish Co. v. United States, supra,* 330 F.2d at 965, 165 Ct.Cl. at 636; *Avis Rent A Car System, Inc. v. United States, supra,* 503 F.2d at 429.

(5) The operator's work was performed in the course of plaintiff Morish's regular business as the owner of an auto wrecker service. *Illinois Tri-Seal Products, Inc. v. United States, supra,* 353 F.2d at 228, 173 Ct.Cl. at 519; *Avis Rent A Car System, Inc. v. United States, supra,* 503 F.2d at 429.

(6) The operator was not called upon to exercise any managerial qualities in order to enhance the opportunity for profit or minimize the risk of loss on the operator's part. *United States v. Silk, supra,* 331 U.S. at 719, 67 S.Ct. 1463; *Avis Rent A Car System, Inc. v. United States, supra,* 503 F.2d at 429.

Plaintiff Morish, in contending that the operators of his auto wrecker trucks were not his employees, relies principally on the *Party Cab Co.* and *New Deal Cab Co.* cases, previously cited, in which the Courts of Appeals for the Seventh and Fifth Circuits, respectively, held that taxicab drivers were not the employees of companies owning the taxicabs which the drivers operated. The facts in those two cases are readily distinguishable, however, from the facts in plaintiff Morish's case. There, each taxicab driver rented a taxicab from the owner at a flat daily rental; the driver also defrayed the principal expense involved in the operation of the taxicab (*i. e.,* the cost of the gasoline in both cases, and also the cost of the oil in *Party Cab Co.*); and the driver kept all the fares that he was able to earn through the operation of the taxicab. Thus, each driver was, in essence, a small businessman, either making a profit of sustaining a loss on his activities, depending on the relationship between the total amount of the fares collected, on the one hand, and the total amount of the expenses incurred, on the other hand.

By contrast, the operator of one of plaintiff Morish's auto wrecker trucks did not have any fixed rental obligation, he did not bear any part of the expense incident to the operation of the truck, and he was required to account for, and to share with plaintiff Morish, all towing fees collected through the operation of the truck. For the operator, there was no profit-or-loss factor involved in this relationship.

For the reasons previously stated, it is my opinion that the operators of plaintiff Morish's auto wrecker trucks during the 1968–69 period were his employees for employment tax purposes, and that the Internal Revenue Service did not err in requiring plaintiff Morish to pay employment taxes based on the earnings of the operators.

The same conclusion must be reached in case No. 274–75, involving Bill Morish Wrecker Service, Inc. This company was incorporated by plaintiff Morish in the State of Texas on November 12, 1969. It is wholly owned by plaintiff Morish and members of his immediate family. Effective January 1, 1970, plaintiff Morish leased his auto wrecker trucks to the corporation at a monthly rental of approximately $400 per month for each truck. Thereafter, the corporation, utilizing the auto wrecker trucks leased from plaintiff Morish, carried on the same sort of business that previously had been conducted by plaintiff Morish as a sole proprietorship. The corporation provided auto wrecker trucks to operators under oral arrangements that were similar in all substantial respects to the arrangements which plaintiff Morish had previously made with operators.

The Internal Revenue Service required the corporation to pay employment taxes for the first two quarters of the calendar year 1970, based on the earnings of the truck operators; and case No. 274–75 is a suit by the corporation to recover the amount of such taxes, together with statutory interest.

The suit by the corporation must fail, for the same reasons previously stated in connection with plaintiff Morish's suit in case No. 273–75.

Therefore, neither plaintiff Morish nor the corporation is entitled to recover, and the petitions in both cases should be dismissed.

## FINDINGS OF FACT

1. During the calendar years 1968 and 1969, Fred W. Morish, the plaintiff in case No. 273–75 (who will usually be referred to in subsequent findings as "plaintiff Morish") was doing business in Houston, Texas, as a sole proprietorship under the name of Heights Auto Relief Wrecker Service. The nature of the business is indicated in subsequent findings. (Findings 2–16 all relate to the 1968–69 period.)

2. (a) Plaintiff Morish owned five auto wrecker trucks. He drove one of these trucks himself. His individual activities as a driver are not involved in the present litigation.

(b) Each of the trucks represented an investment to plaintiff Morish of approximately $4,500 to $5,000. The considerable cost of the wrecker permits or tags on the trucks represented an additional expense to plaintiff Morish (see finding 7(c)).

3. Plaintiff Morish's auto wrecker trucks (other than the one which he drove himself) were made available by him for use by a succession of individual drivers under oral agreements which were separately negotiated in each instance between plaintiff Morish and an individual driver (usually referred to hereafter in the findings as "operator") but all of which agreements were similar in nature. The principal aspects of each such agreement are outlined in subsequent findings.

4. Pursuant to the oral agreement between plaintiff Morish and each operator, an auto wrecker truck owned by plaintiff Morish was entrusted to the operator for his use in the business of towing wrecker or otherwise disabled motor vehicles from the places where the vehicles became disabled to repair shops, or to other destinations if so directed by the owners of the disabled vehicles.

5. (a) Fees, the amounts of which were prescribed by the City of Houston, were collected from the owners of disabled motor vehicles for the towing services mentioned in finding 4.

(b) Plaintiff Morish and each operator agreed that they would divide between them on a percentage basis (usually 50–50) all towing fees resulting from the operation of a truck during the period while it was entrusted to the operator.

(c) The operator did not receive any other form of compensation for his work in operating one of plaintiff Morish's trucks.

6. (a) Plaintiff Morish did not have any sort of training program for the operators of auto wrecker trucks owned by him. No great amount of skill was required for the work (beyond competency to drive a truck), and it could be learned by a few days of on-the-job training.

(b) None of the operators of trucks owned by plaintiff Morish was covered by workman's compensation insurance.

(c) Plaintiff Morish did not maintain any health insurance program, or any pension plan, or any profit-sharing arrangement for the benefit of operators of trucks owned by him.

7. (a) In addition to providing the operator with an auto wrecker truck, plaintiff Morish furnished the operator with all the tools and equipment needed in the operation of such a truck, including winch, cable, 2-way radio, police-band radio receiver capable of receiving broadcasts from the Houston Police Department, jack, shovel, axe, broom, tow bars, pinch bar, fire extinguisher, parking flares, and first-aid kit.

(b) There was also attached to the truck a wrecker permit or tag issued by the City of Houston, authorizing the driver of the truck to respond to any broadcast from the Houston Police Department relative to an automobile accident, by going to the scene of the accident and soliciting a towing job if the accident resulted in a wrecked or otherwise disabled vehicle.

(c) Only a limited number of wrecker permits or tags had been issued by the City of Houston, which charged a fee of $120 per year for each permit. These permits or tags were transferrable; and they were in great demand by the owners of auto wrecker trucks. Two of the tags furnished by plaintiff Morish to operators had been acquired by plaintiff Morish at a cost of $5,000 each. Two others were being rented by plaintiff Morish at a monthly rental of $200 each.

(d) Without a wrecker permit or tag, the driver of an auto wrecker truck was not permitted to go to the scene of an automobile accident in response to a broadcast from the Houston Police Department, or to solicit business otherwise. Such a driver could only respond to specific requests for his service.

(e) Plaintiff Morish maintained a shack where operators of his trucks could spend their time while waiting for business, if they desired to do so. They were not required to wait in the shack, or at any other specific place, but could spend waiting periods wherever they wished.

8. Plaintiff Morish paid for all gasoline, oil, batteries, tires, maintenance, repairs, liability insurance, registration fees, ad valorem taxes, and all other expenses incident to the operation of an auto wrecker truck provided by him to an operator.

9. (a) The operator was not required to furnish any of the tools or equipment needed, or to defray any of the expenses involved, in the operation of an auto wrecker truck provided by plaintiff Morish.

(b) It was necessary, however, for the operator to have a chauffeur's license issued by the State of Texas and an emergency wrecker driver's license issued by the City of Houston. Such licenses were obtainable at nominal cost.

10. Plaintiff Morish was a member of the Houston Automobile Wrecker Association, an organization formed by owners of auto wrecker trucks. The association maintained a radio dispatch service, consisting of a centrally located radio transmitting station and dispatchers who would receive incoming telephone calls from automobile repairs shops that needed the services of auto wrecker trucks to tow disabled automobiles from the points where they had become disabled to such shops for repair, and who would then communicate by 2-way radio with drivers of auto wrecker trucks owned by members of the association and inform the drivers of the need for towing services.

11. (a) During the existence of an arrangement between plaintiff Morish and an operator, plaintiff Morish permitted the operator to have complete charge of the auto wrecker truck furnished to him by plaintiff Morish. The operator could go in the truck wherever and whenever he wished to go, except that he was not supposed to take the truck outside the Houston area for personal reasons without first obtaining plaintiff Morish's permission; while awaiting business, the operator could cruise in the truck or he could station himself and the truck at whatever location he deemed desirable; and the operator could keep the truck wherever he wished when off duty (and it was generally kept at the operator's home).

(b) An operator was permitted to exercise his own discretion as to when, where, and how he would work. Plaintiff Morish did not attempt to supervise an operator with respect to the operator's hours of work, or the geographical section or sections of the Houston area where work was to be performed, or the manner in which the operator was to perform his duties as the operator of an auto wrecker truck.

(c) An operator received information concerning disabled automobiles from the radio dispatchers mentioned in finding 10 and from the Houston Police Department's broadcasts. It was discretionary with the

operator as to whether he would or would not respond to a call from a radio dispatcher or to a police broadcast concerning an automobile accident.

(d) Finding 15 should be noted in connection with the matters covered in this finding 11 relative to the wide discretion enjoyed by the operator of an auto wrecker truck provided by plaintiff Morish.

12. (a) Plaintiff Morish had an arrangement with a Houston company known as Lester Goodson Pontiac, which, in connection with an agency for the sale of Pontiac automobiles, operated a shop for the repair of motor vehicles. The pertinent details of this arrangement are set out in the subsequent paragraphs of this finding.

(b) Lester Goodson Pontiac, which did not own or operate any auto wrecker truck itself, was permitted by plaintiff Morish to paint the name of the company on two of plaintiff Morish's four auto wrecker trucks that were operated by individuals other than plaintiff Morish. Thus, the two trucks gave the appearance of being owned and operated by Lester Goodson Pontiac, although no investment or expense was required of that company (except for the cost of painting its name on the trucks).

(c) Because the trucks and operators appeared to represent Lester Goodson Pontiac, that company was concerned about the standard of service provided by the trucks and operators to the company's customers. Lester Goodson Pontiac did not have any right, however, to exercise any sort of authority over the trucks or the operators.

(d) If a person communicated with Lester Goodson Pontiac and asked that a tow truck be sent out to tow a disabled vehicle to Lester Goodson Pontiac for a repair job, Lester Goodson Pontiac telephoned this information to the radio dispatch service mentioned in finding 10. A radio dispatcher then endeavored to get in touch by radio with, and give the assignment to, an operator of one of plaintiff Morish's auto wrecker trucks bearing the name of Lester Goodson Pontiac. If the operators of both of plaintiff Morish's trucks bearing the name of Lester Goodson Pontiac were unavailable

for the assignment (either because they were otherwise engaged or because they did not wish to accept the assignment), the radio dispatcher would next endeavor to communicate with, and give the assignment to, an operator of one of the other auto wrecker trucks owned by plaintiff Morish; and, if that attempt was unsuccessful, the radio dispatcher would endeavor to communicate with, and give the assignment to, plaintiff Morish himself. If none of plaintiff Morish's trucks was available for the assignment, the radio dispatcher would communicate with, and give the assignment to, the driver of an auto wrecker truck owned by some other member of the Houston Automobile Wrecker Association.

(e) If the operator of one of plaintiff Morish's auto wrecker trucks bearing the name of Lester Goodson Pontiac responded to a broadcast from the Houston Police Department relative to an automobile accident and was engaged to tow a disabled vehicle to a shop for repairs, and if the owner of the disabled vehicle did not have any preference regarding the shop to which the vehicle was to be taken, the operator would tow the disabled vehicle to Lester Goodson Pontiac, so that the repair job could be done by that company.

(f) When the operator of one of plaintiff Morish's auto wrecker trucks towed a disabled automobile to Lester Goodson Pontiac, the company collected the towing fee (the amount of which was fixed by the City of Houston) from the owner of the disabled vehicle, and subsequently remitted the full amount of the fee to plaintiff Morish, who then divided the fee with the operator in accordance with the agreement between them (usually 50–50).

(g) If the operator of one of plaintiff Morish's auto wrecker trucks was himself responsible for a disabled vehicle being taken to Lester Goodson Pontiac rather than to some other repair shop (e. g., see (e) of this finding), Lester Goodson Pontiac, in addition to remitting the full amount of the towing fee to plaintiff Morish, also paid him a commission amounting to 5 percent of the repair charges collected by Lester Goodson

Pontiac from the owner of the vehicle. The operator, in this situation, subsequently received from plaintiff Morish the operator's share (usually one-half) of the towing fee, but the operator was not entitled to any portion of plaintiff Morish's 5 percent commission on the repair charges.

(h) Plaintiff Morish and the respective operators of his auto wrecker trucks had irregular but frequent settlements for the purpose of dividing the towing fees earned from the operation of the trucks.

13. Plaintiff Morish also had an arrangement with a company known as Champion Chevrolet that was similar in all substantial respects to the arrangement with Lester Goodson Pontiac, as outlined in finding 12.

14. If an operator of one of plaintiff Morish's auto wrecker trucks received an assignment from a radio dispatcher (see finding 10) to tow a disabled automobile to some place other than Lester Goodson Pontiac or Champion Chevrolet, or if the operator responded to a broadcast from the Houston Police Department concerning an automobile accident and was engaged to take a disabled vehicle to some place other than Lester Goodson Pontiac or Champion Chevrolet, or if the operator, through his own "hustling," obtained a towing job that did not involve delivery of the disabled vehicle to Lester Goodson Pontiac or Champion Chevrolet, the operator collected the prescribed towing fee from the owner of the vehicle and subsequently paid over to plaintiff Morish the latter's proper share (usually one-half) of the fee.

15. (a) The arrangement between plaintiff Morish and an operator of an auto wrecker truck owned by plaintiff Morish was terminable by either party at any time, without cause and without any necessity for the party terminating the arrangement to give an explanation to the other party.

(b) If an operator was not doing enough work and generating enough business in the form of towing fees and commissions on repair jobs to satisfy plaintiff Morish, the latter could terminate the arrangement at any time and direct that the operator re-turn to plaintiff Morish the auto wrecker truck previously entrusted to the operator.

(c) If Lester Goodson Pontiac or Champion Chevrolet was dissatisfied with the way in which an operator of a truck bearing the particular company's name had handled a towing job or jobs for a customer or customers of the company (this being a matter of concern to the company, as the operator was apt to be regarded by the public as an employee of the company), such company would complain to plaintiff Morish (the company itself did not have any authority over the operator), and plaintiff Morish would endeavor to straighten the matter out to the satisfaction of the complaining company. If this could not be done, plaintiff Morish would either terminate the arrangement with the operator or make available for his use another wrecker auto truck that did not bear the name of the complaining company.

(d) Plaintiff Morish did not act arbitrarily in terminating the arrangement with an operator. If an operator was not earning enough towing fees to satisfy plaintiff Morish, or if plaintiff Morish received a report indicating that an operator had been discourteous, drunk, disorderly, or involved in an accident, or if plaintiff Morish was otherwise concerned over the performance of an operator, plaintiff Morish would first discuss the matter with the operator and endeavor to induce the operator to improve his performance. If the problem could not be resolved to the satisfaction of plaintiff Morish, he would terminate the arrangement with the operator, or sometimes the operator would take the initiative in terminating the arrangement.

(e) For his business to be successful, plaintiff Morish needed operators who were dependable, hard-working, and courteous. Such operators enabled plaintiff Morish to make more money on towing fees, and also to maintain a good relationship with Lester Goodson Pontiac and Champion Chevrolet. The commissions which plaintiff Morish received from these companies on repair charges were essential to the financial soundness of plaintiff Morish's business.

(f) Plaintiff Morish maintained radios in his office and in his personally operated auto wrecker truck, so that he could monitor the activities of the operators of his other trucks.

16. (a) Plaintiff Morish did not, for the years 1968 and 1969, make any income tax withholdings, or any FICA or FUTA deductions, with respect to the earnings of the operators of trucks owned by plaintiff Morish.

(b) Sometime during the year 1970, plaintiff Morish was informed by authorized representatives of the Internal Revenue Service that, according to the view of the IRS, plaintiff Morish was the employer of the operators of his auto wrecker trucks, that the operators' respective shares of the amounts earned in operating the trucks constituted wages, and that plaintiff Morish had improperly failed to make—and to remit to the IRS—income tax withholdings and FICA and FUTA deductions on such wages. There ensued negotiations between plaintiff Morish and the IRS, and these culminated in a demand by the IRS that plaintiff Morish pay an overall deficiency in the amount of $8,005.45, together with interest, representing income tax withholdings and FICA and FUTA deductions for 1968 and 1969.

(c) The deficiency mentioned in paragraph (b) of this finding, together with interest, was paid by plaintiff Morish during 1971 in three installments.

(d) On November 14, 1972, plaintiff Morish filed with the Internal Revenue Service refund claims with respect to the payments mentioned in paragraph (c) of this finding. Such claims were disallowed by the IRS on August 10, 1973.

17. (a) On November 12, 1969, plaintiff Morish incorporated in the State of Texas a company known as Bill Morish Wrecker Service, Inc., which is the plaintiff in case No. 274–75 (and which will usually be referred hereafter in the findings as "plaintiff corporation").

(b) Plaintiff corporation is wholly owned by plaintiff Morish and members of this immediate family. Of the 1,000 shares of stock in plaintiff corporation that were issued, 999 are owned by plaintiff Morish and his wife as part of their community property, and one share is owned by their son, Jerry W. Morish.

(c) Plaintiff Morish is President and Treasurer of plaintiff corporation, his wife is Vice-President of the corporation, and their son is Secretary of the corporation.

18. (a) Effective January 1, 1970, plaintiff Morish leased his auto wrecker trucks to plaintiff corporation, the rental price for each truck being approximately $400 per month.

(b) During the calendar year 1970, plaintiff corporation, utilizing the auto wrecker trucks leased from plaintiff Morish, carried on the same sort of business that previously had been conducted by plaintiff Morish as a sole proprietorship.

(c) Plaintiff corporation provided the trucks to the operators and made oral arrangements with the operators that were similar in all substantial respects to the arrangements which plaintiff Morish had previously made with operators.

19. (a) For the first two quarters of the calendar year 1970, plaintiff corporation did not make any income tax withholdings, or any FICA or FUTA deductions, with respect to the earnings of the operators of auto wrecker trucks provided by plaintiff corporation.

(b) Sometime during the year 1970, plaintiff corporation was informed by authorized representatives of the Internal Revenue Service that, according to the view of the IRS, plaintiff corporation was the employer of the operators of the auto wrecker trucks, that the operators' respective shares of the amounts earned in operating the trucks constituted wages, and that plaintiff corporation had improperly failed to make—and to remit to the IRS—income tax withholdings and FICA and FUTA deductions on such wages. There ensued negotiations between plaintiff corporation and the IRS, and these culminated in a demand by the IRS that plaintiff corporation pay an over-

all deficiency in the amount of $2,563.59, together with interest, representing income tax withholdings and FICA and FUTA deductions for the first two quarters of 1970.

(c) The deficiency mentioned in paragraph (b) of this finding, together with interest, was paid by plaintiff corporation during 1971 in three installments.

(d) On November 14, 1972, plaintiff corporation filed with the Internal Revenue Service refund claims with respect to the payments mentioned in paragraph (c) of this finding. Such claims were disallowed by the IRS on August 6, 1973.

20. (a) Plaintiff Morish was the employer of the operators of the auto wrecker trucks which plaintiff Morish owned and provided to the operators during the years 1968 and 1969.

(b) Plaintiff corporation was the employer of the operators of the auto wrecker trucks which plaintiff corporation leased from plaintiff Morish and provided to the operators during the first two quarters of 1970.

### CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petitions are therefore dismissed.

